# COYLE *v.* SMITH, SECRETARY OF STATE OF THE STATE OF OKLAHOMA.

## ERROR TO THE SUPREME COURT OF THE STATE OF OKLAHOMA.

### No. 941. Argued April 15, 16, 1911.—Decided May 29, 1911.

The power to locate its own seat of government, to change the same, and to appropriate its public money therefor, are essentially state powers beyond the control of Congress.

The power given to Congress by Art. IV, § 3, of the Constitution is to admit new States to this Union, and relates only to such States as are equal to each other in power and dignity and competency to exert the residuum of sovereignty not delegated to the Federal Government.

The constitutional duty of Congress of guaranteeing to each State a republican form of government does not import a power to impose upon a new State, as a condition to its admission to the Union, restrictions which render it unequal to the other States, such as limitations upon its power to locate or change its seat of government.

No prior decision of this court sanctions the claim that Congress in admitting a new State can impose conditions in the enabling act, the acceptance whereof will deprive the State when admitted of any attribute of power essential to its equality with the other States.

Congress may embrace in an enabling act conditions relating to matters wholly within its sphere of powers, such as regulations of interstate commerce, intercourse with Indian tribes and disposition of public lands, but not conditions relating wholly to matters under state control such as the location and change of the seat of government of the State.

The Constitution not only looks to an indestructible union of indestructible States, *Texas* v. *White*, 7 Wall. 700, 725, but to a union of equal States as well.

The legislature of Oklahoma has power to locate its own seat of government, to change the same and to appropriate money therefor, notwithstanding any provisions to the contrary in the Enabling Act of June 16, 1906, 34 Stat. 267, c. 3335, and the ordinance irrevocable of the convention of the people of Oklahoma accepting the same.

113 Pac. Rep. 944, affirmed.

THE facts, which involve the constitutionality of a legislative act of Oklahoma, providing for the removal of the capital of the State from Guthrie to Oklahoma City, are stated in the opinion.

Mr. *Frank Dale*, Mr. *C. G. Hornor* and Mr. *John H. Burford*, with whom Mr. *A. G. C. Bierer*, Mr. *Frank B. Burford* and Mr. *Benj. F. Hegler* were on the brief, for plaintiff in error:

The people of Oklahoma, under the enabling act, secured a republican form of government. *State* v. *Harris* (S. C.), 2 Bailey, 598. There is considerable diversity between the enabling acts of the States. As to Arkansas, there are provisions which are not in any respect similar to those of Oklahoma. So also as to Alabama, Louisiana, Missouri and other States.

In California, the people prepared and presented a constitution and Congress admitted the State upon such constitution, with express provisions limiting the powers of the people under their constitution; so as to Mississippi and Michigan. In the Utah enabling act there is a provision against plural marriage which does not appear in many of the enabling acts. See special provisions also in the Nebraska act. *Brittle* v. *The People*, 2 Nebraska, 198; and see collection of enabling acts in Thorpe's American Charters and Constitutions, vols. 1 to 7 inclusive.

As to what is meant by the term "equality," see *Spooner* v. *McConnell*, 1 McClain, 337, holding that if the meaning be that the people of the new State, exercising the sovereign powers which belong to the people of any other State, shall be admitted into the Union, subject to such provisions in their fundamental law as they shall have sanctioned, within the restrictions of the Federal Constitution, then the States are equal in rank—equal in their powers of sovereignty. They only differ, under such conditions in those restrictions, which, in the exercise of their own

powers, they may have voluntarily imposed upon themselves. See also *Hogg* v. *Zanesville Canal Co.,* 5 Ohio, 416.

At the time Congress passed the law Oklahoma was a Territory and Congress had the unquestioned right to deal with the matter involved. *Church* v. *United States,* 136 U. S. 1; *Thompson* v. *Utah,* 170 U. S. 343.

Congress has not repealed the law. It is not claimed that a repeal was intended; so, if repealed, it must be by implication, and repeals by implication are not favored.

For other cases, involving compacts between States and the United States, and which sustain appellant's contention, see *Bennett* v. *Boggs,* Fed. Cas. No. 1,319; *Vaughan* v. *Williams,* 3 McClain, 530, Fed. Cas. No. 16,903; *Minnesota* v. *Bachelder,* 1 Wall. 109, 114; *Virginia* v. *West Virginia,* 11 Wall. 39; *White* v. *Hart,* 13 Wall. 646; *Marsh* v. *Burroughs,* 1 Woods, 463; *Romine* v. *State of Washington,* 34 Pac. Rep. 924; *Brittle* v. *The People,* 2 Nebraska, 198, *Green* v. *Biddle,* 8 Wheat. 1; *Hawkins* v. *Barney's Lessee,* 5 Pet. 456; *Albee* v. *May,* Fed. Cas. No. 134; *Hancock* v. *Walsh,* 3 Woods, 351; *Gray* v. *Davis,* 1 Woods, 430; *United States* v. *Partello,* 48 Fed. Rep. 670; *The Kansas Indians,* 5 Wall. 737; *Beecher* v. *Wetherby,* 95 U. S. 517, 522; *People* v. *Roberts,* 18 How. 173; *Boyd* v. *Thayer,* 143 U. S. 135.

The cases cited and quoted by the court in the majority opinion below do not sustain the decision.

In the formation of the Federal Union, each of the original colonies, upon entering the Union, surrendered some of its sovereign powers, and deprived itself of the power to exercise others.

Each State which has come into the Union since the formation of the Government of the United States has, either at the request or upon requirement of Congress, temporarily or permanently deprived itself of the power to exercise some of the attributes of sovereignty. And by so doing the State has not been admitted upon an unequal

footing with other States.   Equality among the States, or as termed by the courts, an equal footing with the original States, means the possession of sovereignty, the power to exercise the functions of a republican form of government, not necessarily in the same manner or to the same extent.   *Ableman* v. *Booth,* 21 How. 506; Vattel's Law of Nations, 3, 193, 196, 229; Baker's Int. Law, 24, 27, 43, 94.

The compact of the enabling act was entered into by the high contracting parties for good and sufficient reasons of state, which is all the consideration that is needed to support a public treaty, compact or convention.   Of course in the present case there was a "consideration" in the ordinary sense.   Wheaton, Int. Law, 377; Maxey's Int. Law, 26, 27; 1 Moore's Dig. Int. Law, 19; Grotius, B. 1, c. 3, §§ 16, 18; *Matheny* v. *Golden,* 5 Oh. St. 368.

Many of the Territories have yielded portions of sovereignty in order to become States (the brief refers to numerous instances).

The contemporary and departmental interpretation and *stare decisis* sustain plaintiff in error.

*Mr. Charles West,* Attorney General of Oklahoma, *Mr. B. F. Burwell* and *Mr. J. W. Bailey,* with whom *Mr. C. B. Stuart* and *Mr. W. A. Ledbetter* were on the brief, for defendant in error.

MR. JUSTICE LURTON delivered the opinion of the court.

This is a writ of error to the Supreme Court of Oklahoma to review the judgment of that court upholding a legislative act of the State providing for the removal of its capital from Guthrie to Oklahoma City, and making an appropriation from the funds of the State for the purpose of carrying out the act, by the erection of the necessary state buildings.   (Act of Oklahoma, December 29, 1910) not yet published.

The opinion of the Supreme Court of Oklahoma may be found in 113 Pac. Rep. 944.

By an act passed December 7, 1910, the State gave to its Supreme Court "original jurisdiction" to entertain any proceeding brought in that court by resident taxpayers of the State to have determined. "the legality of the removal or location or attempt to remove or locate the state capital" and certain other state institutions. This act was passed in advance of the removal act here involved, and for the express purpose of providing a speedy method for the determination of constitutional objections which might be urged against the proposed relocation of the seat of the state government. The Removal Act followed, and this proceeding was at once started in the Supreme Court of the State by the plaintiffs in error, who claimed not only to be citizens and taxpayers of the State, but also owners of large property interests in Guthrie, which would be adversely affected by the removal of the seat of government as proposed by the act in question. The validity of the law locating the capital at Oklahoma City was attacked for many reasons which involved only the interpretation and application of the constitution of the State. These were all decided adversely to the petitioners. We shall pass them by as matters of state law, not subject to the reviewing power of this court under a writ of error to a state court.

The question reviewable under this writ of error, if any there be, arises under the claim set up by the petitioners, and decided against them, that the Oklahoma act of December 29, 1910, providing for the immediate location of the capital of the State at Oklahoma City was void as repugnant to the Enabling Act of Congress of June 16, 1906, under which the State was admitted to the Union. 34 Stat. 267, c. 3335. The act referred to is entitled "An act to enable the people of Oklahoma and the Indian Territory to form a constitution and state

government and be admitted into the Union on an equal footing with the original States," etc. The same act provides for the admission of Arizona and New Mexico. The first twenty-two sections relate only to Oklahoma. The second section is lengthy and deals with the organization of a constitutional convention and concludes in these words: "The capital of said State shall temporarily be at the city of Guthrie, and shall not be changed therefrom previous to Anno Domini Nineteen Hundred and Thirteen, but said capital shall after said year be located by the electors of said State at an election to be provided for by the legislature; provided, however, that the legislature of said State, except as shall be necessary for the convenient transaction of the public business of said State at said capital, shall not appropriate any public moneys of the State for the erection of buildings for capital purposes during said period."

Other sections of the act require that the constitution of the proposed new State shall include many specific provisions concerning the framework of the government, and some which impose limitations upon the State as regards the Indians therein, and their reservations, in respect of traffic in liquor among the Indians or upon their reservations. The twenty-second and last section applicable to Oklahoma reads thus: "That the constitutional convention provided for herein shall, by ordinance irrevocable, accept the terms and conditions of this act."

The constitution as framed contains nothing as to the location of the State capital; but the convention which framed it adopted a separate ordinance in these words:

"SEC. 497. Enabling Act accepted by Ordinance Irrevocable. Be it ordained by the Constitutional Convention for the proposed State of Oklahoma, that said Constitutional Convention do, by this ordinance irrevocable, accept the terms and conditions of an Act of Congress of the United States, entitled 'An Act to Enable the People

of Oklahoma and the Indian Territory to form a Constitution and State Government and be admitted into the Union on an equal footing with the original States; and to Enable the People of New Mexico and Arizona to form a Constitution and State Government and be admitted into the Union on an equal footing with the original States,' approved June the sixteenth, Anno Domini, Nineteen Hundred and Six."

This was submitted along with the constitution as a separate matter and was ratified as was the constitution proper.

The efficacy of this ordinance as a law of the State conflicting with the removal act of 1910 was, of course, a state question. The only question for review by us is whether the provision of the enabling act was a valid limitation upon the power of the State after its admission, which overrides any subsequent state legislation repugnant thereto.

The power to locate its own seat of government and to determine when and how it shall be changed from one place to another, and to appropriate its own public funds for that purpose, are essentially and peculiarly state powers. That one of the original thirteen States could now be shorn of such powers by an act of Congress would not be for a moment entertained. The question then comes to this: Can a State be placed upon a plane of inequality with its sister States in the Union if the Congress chooses to impose conditions which so operate, at the time of its admission? The argument is, that while Congress may not deprive a State of any power which it *possesses*, it may, as a condition to the admission of a new State, constitutionally restrict its authority, to the extent at least, of suspending its powers for a definite time in respect to the location of its seat of government. This contention is predicated upon the constitutional power of admitting new States to this Union, and the constitu-

tional duty of guaranteeing to "every State in this Union a republican form of government." The position of counsel for the appellants is substantially this: That the power of Congress to admit new States and to determine whether or not its fundamental law is republican in form, are political powers, and as such, uncontrollable by the courts. That Congress may in the exercise of such power impose terms and conditions upon the admission of the proposed new State, which, if accepted, will be obligatory, although they operate to deprive the State of powers which it would otherwise possess, and, therefore, not admitted upon "an equal footing with the original States."

The power of Congress in respect to the admission of new States is found in the third section of the fourth Article of the Constitution. That provision is that, "new States may be admitted by the Congress into this Union." The only expressed restriction upon this power is that no new State shall be formed within the jurisdiction of any other State, nor by the junction of two or more States, or parts of States, without the consent of such States, as well as of the Congress.

But what is this power? It is not to admit political organizations which are less or greater, or different in dignity or power, from those political entities which constitute the Union. It is, as strongly put by counsel, a "power to admit States."

The definition of "a State" is found in the powers possessed by the original States which adopted the Constitution, a definition emphasized by the terms employed in all subsequent acts of Congress admitting new States into the Union. The first two States admitted into the Union were the States of Vermont and Kentucky, one as of March 4, 1791, and the other as of June 1, 1792. No terms or conditions were exacted from either. Each act declares that the State is admitted "as a new and *entire member* of the United States of America." 1 Stat.

189, 191. Emphatic and significant as is the phrase admitted as "an entire member," even stronger was the declaration upon the admission in 1796 of Tennessee, as the third new State, it being declared to be "one of the United States of America," "on an equal footing with the original States in all respects whatsoever," phraseology which has ever since been substantially followed in admission acts, concluding with the Oklahoma act, which declares that Oklahoma shall be admitted "on an equal footing with the original States."

The power is to admit "new States into *this* Union."

"This Union" was and is a union of States, equal in power, dignity and authority, each competent to exert that residuum of sovereignty not delegated to the United States by the Constitution itself. To maintain otherwise would be to say that the Union, through the power of Congress to admit new States, might come to be a union of States unequal in power, as including States whose powers were restricted only by the Constitution, with others whose powers had been further restricted by an act of Congress accepted as a condition of admission. Thus it would result, first, that the powers of Congress would not be defined by the Constitution alone, but in respect to new States, enlarged or restricted by the conditions imposed upon new States by its own legislation admitting them into the Union; and, second, that such new States might not exercise all of the powers which had not been delegated by the Constitution, but only such as had not been further bargained away as conditions of admission.

The argument that Congress derives from the duty of "guaranteeing to each State in this Union a republican form of government," power to impose restrictions upon a new State which deprives it of equality with other members of the Union, has no merit. It may imply the duty of such new State to provide itself with such state government, and impose upon Congress the duty of seeing that

such form is not changed to one anti-republican,—*Minor v. Happersett*, 21 Wall, 162, 174, 175,—but it obviously does not confer power to admit a new State which shall be any less a State than those which compose the Union.

We come now to the question as to whether there is anything in the decisions of this court which sanctions the claim that Congress may by the imposition of conditions in an enabling act deprive a new State of any of those attributes essential to its equality in dignity and power with other States. In considering the decisions of this court bearing upon the question, we must distinguish, first, between provisions which are fulfilled by the admission of the State; second, between compacts or affirmative legislation intended to operate *in futuro*, which are within the scope of the conceded powers of Congress over the subject; and third, compacts or affirmative legislation which operates to restrict the powers of such new States in respect of matters which would otherwise be exclusively within the sphere of state power.

As to requirements in such enabling acts as relate only to the contents of the constitution for the proposed new State, little need to be said. The constitutional provision concerning the admission of new States is not a mandate, but a power to be exercised with discretion. From this alone it would follow that Congress may require, under penalty of denying admission, that the organic laws of a new State at the time of admission shall be such as to meet its approval. A constitution thus supervised by Congress would, after all, be a constitution of a State, and as such subject to alteration and amendment by the State after admission. Its force would be that of a state constitution, and not that of an act of Congress.

The case of *Permoli* v. *First Municipality*, 3 How. 589, 609, is in point. By the act of February 20, 1811, the people of the Territory of Orleans were empowered to form a constitution and state government. The third

section of that act prescribed, among other things, that it should "contain the fundamental principles of civil and religious liberty." The act of 1812 admitting the State provided, "that all the conditions and terms contained in said third section should be considered, deemed and taken as fundamental conditions and terms, upon which the said State is incorporated into the Union." It was claimed that a certain municipal ordinance was in violation of religious liberty, and therefore void, as repugnant to the act under which the State had been admitted to the Union. Dealing with those terms of the enabling and admitting acts in respect to the contents of the constitution to be adopted by the people of the Territory seeking admission as a State, this court, speaking by Mr. Justice Catron, said:

"All Congress intended, was to declare in advance to the people of the territory, the fundamental principles their constitution should contain; this was every way proper under the circumstances; the instrument having been duly formed, and presented, it was for the national legislature to judge whether it contained the proper principles, and to accept it if it did; or reject it if it did not. Having accepted the constitution and admitted the state 'on an equal footing with the original States in all respects whatever,' in express terms, by the act of 1812, Congress was concluded from assuming that the instructions contained in the act of 1811 had not been complied with. No fundamental principles could be added by way of amendment, as this would have been making part of the state constitution; if Congress could make it in part, it might, in the form of amendment, make it entire. The conditions and terms referred to in the act of 1812, could only relate to the stipulations contained in the second proviso of the act of 1811, involving rights of property and navigation; and in our opinion were not otherwise intended."

The reference by Justice Catron to the terms and conditions in act of 1812, is to a provision in the act of February 20, 1811 (2 Stat. 641, 642), quite common in enabling acts, by which the new State disclaimed title to the public lands, and stipulated that such lands should remain subject to the sole disposition of the United States, and for their exemption from taxation, and that its navigable waters should forever remain open and free, etc. Such stipulations, as we shall see, being within the sphere of congressional power, can derive no force from the consent of the State. Like stipulations, as well as others in respect to the control by the United States of large Indian reservations and Indian population of the new State, are found in the Oklahoma enabling act. Whatever force such provisions have after the admission of the State may be attributed to the power of Congress over the subjects, derived from other provisions of the Constitution, rather than from any consent by or compact with the State.

So far as this court has found occasion to advert to the effect of enabling acts as affirmative legislation affecting the power of new States after admission, there is to be found no sanction for the contention that any State may be deprived of any of the power constitutionally possessed by other States, as States, by reason of the terms in which the acts admitting them to the Union have been framed.

The case of *Pollard's Lessee* v. *Hagan*, 3 How. 212, is a most instructing and controlling case. It involved the title to the submerged lands between the shores of navigable waters within the State of Alabama. The plaintiff claimed under a patent from the United States, and the defendant under a grant from the State. The plaintiff relied upon two propositions which are relevant to the question here. One was that in the act under which Alabama was admitted to the Union there was a stipulation that the people of Alabama forever disclaimed all right or title to the waste or unappropriated lands lying

within the State, and that they should remain at the sole disposal of the United States, and a second, that all of the navigable waters within the State should forever remain public highways and free to the citizens of that State and of the United States, without any tax, duty or impost imposed by the State. These provisions were relied upon as a "compact" by which the United States became possessed of all such submerged lands between the shores of navigable rivers within the State.

The points decided were:

First, following *Martin* v. *Waddell*, 16 Pet. 410, that prior to the adoption of the Constitution, the people of each of the original States "held the absolute right to all of their navigable waters and the soil under them for their common use, subject only to the rights since surrendered by the Constitution."

Second. That Alabama had succeeded to all the sovereignty and jurisdiction of all the territory within her limits, to the same extent that Georgia possessed it before she ceded that territory to the United States.

Third. That to Alabama belong the navigable waters, and soils under them.

The court held that the stipulation in the act under which Alabama was admitted to the Union, that the people of the proposed State "forever disclaim all rights and title to the waste or unappropriated lands lying within the said territory, and that the same shall be and remain at the sole and entire disposition of the United States," cannot operate as a contract between the parties, but is binding as law. As to this the court said: '

"Full power is given to Congress 'to make all needful rules and regulations respecting the territory or other property of the United States.' This authorized the passage of all laws necessary to secure the rights of the United States to the public lands, and to provide for their sale, and to protect them from taxation.

"And all constitutional laws are binding on the people, in the new states and the old ones, whether they consent to be bound by them or not. Every constitutional act of Congress is passed by the will of the people of the United States, expressed through their representatives, on the subject-matter of the enactment; and when so passed it becomes the supreme law of the land, and operates by its own force on the subject-matter, in whatever State or Territory it may happen to be. The proposition, therefore, that such a law cannot operate upon the subject-matter of its enactment, without the express consent of the people of the new State, where it may happen to be, contains its own refutation, and requires no farther examination. The propositions submitted to the people of the Alabama Territory, for their acceptance or rejection, by the act of Congress authorizing them to form a constitution and state government for themselves, so far as they related to the public lands within that Territory amounted to nothing more nor less than rules and regulations respecting the sales and disposition of public lands. The supposed compact relied on by the counsel for the plaintiffs, conferred no authority, therefore, on Congress to pass the act granting to the plaintiffs the land in controversy."

Fourth. As to the stipulation in the same admission act that all navigable waters within the State should forever remain open and free, the court, after deciding that to the original States belonged the absolute right to the navigable waters within the States and the soil under them for the public use, "subject only to the rights since surrendered by the Constitution," said:

"Alabama is, therefore, entitled to the sovereignty and jurisdiction over all the territory within her limits, subject to the common law, to the same extent that Georgia possessed it before she ceded it to the United States. To maintain any other doctrine, is to deny that Alabama has

been admitted into the union on an equal footing with the original States, the constitution, laws, and compact, to the contrary notwithstanding."

The plain deduction from this case is that when a new State is admitted into the Union, it is so admitted with all of the powers of sovereignty and jurisdiction which pertain to the original States, and that such powers may not be constitutionally diminished, impaired or shorn away by any conditions, compacts or stipulations embraced in the act under which the new State came into the Union, which would not be valid and effectual if the subject of congressional legislation after admission.

This deduction finds support in *Permoli* v. *First Municipality*, 3 How. 589, from which we have heretofore used an excerpt; and in *Strader* v. *Graham*, 10 How. 82; *Withers* v. *Buckley et al.*, 20 How. 84, 93; *Escanaba Co.* v. *Chicago*, 107 U. S. 678, 688; *Van Brocklin* v. *Tennessee*, 117 U. S. 151, 160; *Huse* v. *Glover*, 119 U. S. 543; *Sands* v. *River Co.*, 123 U. S. 288, 296; *Ward* v. *Race Horse*, 163 U. S. 504; *Bolln* v. *Nebraska*, 176 U. S. 83, 87.

That the power of Congress to regulate commerce, among the States involves the control of the navigable waters of the United States over which such commerce is conducted is undeniable; but it is equally well settled that the control of the State over its internal commerce involves the right to control and regulate navigable streams within the State until Congress acts on the subject. This has been the uniform holding of this court since *Willson* v. *Black Bird Creek Marsh Co.*, 2 Pet. 245; *Gilman* v. *Philadelphia*, 3 Wall. 713; *Escanaba Co.* v. *Chicago*, 107 U. S. 678, 683.

Many of the cases cited above presented the question as to whether state regulation of its own navigable waters, valid as an exercise of its power as a State until Congress should regulate the subject, was invalid because that "plenary power" had been cut down, not by a regulation

of the general subject by Congress, but as a result of a supposed compact, condition or restriction accepted by the State as a condition upon which it was admitted into the Union.

It may well happen that Congress should embrace in an enactment introducing a new State into the Union legislation intended as a regulation of commerce among the States, or with Indian tribes situated within the limits of such new State, or regulations touching the sole care and disposition of the public lands or reservations therein, which might be upheld as legislation within the sphere of the plain power of Congress. But in every such case such legislation would derive its force not from any agreement or compact with the proposed new State, nor by reason of its acceptance of such enactment as a term of admission, but solely because the power of Congress extended to the subject, and, therefore, would not operate to restrict the State's legislative power in respect of any matter which was not plainly within the regulating power of Congress. *Williamette Bridge Co.* v. *Hatch*, 125 U. S. 1, 9. *Pollard's Lessee* v. *Hagan, supra.*

No such question is presented here. The legislation in the Oklahoma enabling act relating to the location of the capital of the State, if construed as forbidding a removal by the State after its admission as a State, is referable to no power granted to Congress over the subject, and if it is to be upheld at all, it must be implied from the power to admit new States. If power to impose such a restriction upon the general and undelegated power of a State be conceded as implied from the power to admit a new State, where is the line to be drawn against restrictions imposed upon new States. The insistence finds no support in the decisions of this court. In *Withers* v. *Buckley*, 20 How. 84, 92, 93, where it was contended that certain legislation of the State of Mississippi interfering with the free navigation of one of the navigable streams of the State, con-

flicted with one of the stipulations in the act under which the State had been admitted to the Union, Congress not having otherwise legislated upon the subject, it was said:

"In considering this act of Congress of March 1st, 1817, it is unnecessary to institute any examination or criticism as to its legitimate meaning, or operation, or binding authority, farther than to affirm that it could have no effect to restrict the new State in any of its necessary attributes as an independent sovereign government, nor to inhibit or diminish its perfect equality with the other members of the Confederacy with which it was to be associated. These conclusions follow from the very nature and objects of the Confederacy, from the language of the Constitution adopted by the States, and from the rule of interpretation pronounced by this court in the case of *Pollard's Lessee* v. *Hagan*, 3 How. p. 223."

In *Escanaba Co.* v. *Chicago*, cited above, it was contended that the control of the State of Illinois over its internal waters had been restricted by the ordinance of 1787, and by the reference to that ordinance in the act of Congress admitting the State. Concerning this insistence, this court, speaking by Mr. Justice Field, said:

"Whatever the limitation upon her powers as a government whilst in a territorial condition, whether from the ordinance of 1787 or the legislation of Congress, it ceased to have any operative force, except as voluntarily adopted by her, after she became a State of the Union. On her admission she at once became entitled to and possessed of all the rights of dominion and sovereignty which belonged to the original States. She was admitted, and could be admitted, only on the same footing with them. The language of the resolution admitting her is 'on an equal footing with the original States in all respects whatever.' 3 Stat. 536. Equality of constitutional right and power is the condition of all the States of the Union, old and new.

Illinois, therefore, as was well observed by counsel, could afterwards exercise the same power over rivers within her limits that Delaware exercised over Black Bird Creek, and Pennsylvania over the Schuylkill River. *Pollard's Lessee* v. *Hagan*, 3 How. 212; *Permoli* v. *First Municipality*, id. 589; *Strader* v. *Graham*, 10 id. 82."

In *Ward* v. *Race Horse, supra*, the necessary equality of the new State with the original States is asserted and maintained against the claim that the police power of the State of Wyoming over its wild game had been restricted by an Indian treaty made prior to the admission of the State of Wyoming.

In *Bolln* v. *Nebraska*, 176 U. S. 83, 89, it appeared that the act under which Nebraska had been admitted had, among other things, required the convention organized to form a constitution for the proposed State to adopt for the people of that State the Constitution of the United States. This was done. It was claimed as a result that the power of the State to authorize the prosecution of a felony by information had been restricted, because the United States could, under one of the amendments to the Constitution, prosecute only by indictment. In respect to this claim the court said:

"But conceding all that can be claimed in this connection, and that the State of Nebraska did enter the Union under the condition of the Enabling Act, and that it adopted the Constitution of the United States as its fundamental law, all that was meant by these words was that the State acknowledged, as every other State has done, the supremacy of the Federal Constitution. The first section of the act of 1867, admitting the State into the Union, declared: 'that it is hereby admitted into the Union upon an equal footing with the original States in all respects whatsoever.' It is impossible to suppose that, by such indefinite language as was used in the Enabling Act, Congress intended to differentiate Nebraska from her sister

States, even if it had the power to do so, and attempt to impose more onerous conditions upon her than upon them, or that in cases arising in Nebraska a different construction should be given to her constitution from that given to the constitutions of other States. But this court has held in many cases that, whatever be the limitations upon the power of a territorial government, they cease to have any operative force, except as voluntarily adopted after such territory has become a State of the Union. Upon the admission of a State it becomes entitled to and possesses all the rights of dominion and sovereignty which belonged to the original States, and, in the language of the act of 1867 admitting the State of Nebraksa, it stands 'upon an equal footing with the original States in all respects whatsoever.' "

We are unable to find in any of the decisions of this court cited by counsel for the appellants anything which contravenes the view we have expressed. *Green* v. *Biddle,* 8 Wheat. 1, involved the question as to whether a compact between two States, assented to by Congress, by which private land titles in Kentucky, derived from Virginia before the separation of Kentucky from Virginia, "should remain valid and secure under the laws of the proposed State of Kentucky, and should be determined by the laws now existing in this (Virginia) State." By subsequent legislation of the State of Kentucky these titles were adversely affected. This court held that this legislation impaired the obligation of a valid contract within that clause of the Constitution forbidding such impairment. Neither does *Virginia* v. *West Virginia,* 11 Wall. 39, have any bearing here. The question there was one of compact between the two States, assented to by Congress, concerning the boundary between them. Both the cases last referred to concerned compacts between States, authorized by the Constitution when assented to by Congress. They were therefore compacts and agreements

sanctioned by the Constitution, while the one here sought
to be enforced is one having no sanction in that instrument.

*Beecher* v. *Wetherby*, 95 U. S. 517, involved the validity
of the grant of every sixteenth section in each township for
school purposes. The grant was made by the act providing for the organization of a state government for the Territory of Wisconsin, and purported to be upon condition
that the proposed State should never interfere with the
primary disposal of the public lands of the United States,
nor subject them to taxation. The grant was held to operate as a grant taking effect so soon as the necessary surveys were made. The conditions assented to by the State
were obviously such as obtained no force from the assent
of the State, since they might have been exacted as an exertion of the proper power of Congress to make rules and
regulations as to the disposition of the public lands.
*Minnesota* v. *Bachelder*, 1 Wall. 109, is another case which
involved nothing more than an exertion by Congress of its
power to regulate the disposition of the public lands.

The case of the *Kansas Indians*, 5 Wall. 737, involved
the power of the State of Kansas to tax lands held by the
individual Indians in that State under patents from the
United States. The act providing for the admission of
Kansas into the Union provided that nothing contained
in the constitution of the State should be construed to
"impair the rights of persons or property pertaining to
the Indians of said territory, so long as such rights shall
remain unextinguished by treaty with such Indians." It
was held that so long as the tribal organization of such Indians was recognized as still existing, such lands were not
subject to taxation by the State. The result might be
well upheld either as an exertion of the power of Congress
over Indian tribes, with whom the United States had
treaty relations, or as a contract by which the State had
agreed to forego taxation of Indian lands, a contract quite

within the power of a State to make, whether made with the United States for the benefit of its Indian wards, or with a private corporation for the supposed advantages resulting. Certainly the case has no bearing upon a compact by which the general legislative power of the State is to be impaired with reference to a matter pertaining purely to the internal policy of the State. See *Stearns* v. *Minnesota,* 179 U. S. 223.

No good can result from a consideration of the other cases cited by plaintiffs in error. None of them bear any more closely upon the question here involved than those referred to. If anything was needed to complete the argument against the assertion that Oklahoma has not been admitted to the Union upon an equality of power, dignity and sovereignty, with Massachusetts or Virginia, it is afforded by the express provision of the act of admission, by which it is declared that when the people of the proposed new State have complied with the terms of the act that it shall be the duty of the President to issue his proclamation, and that "thereupon the proposed State of Oklahoma shall be deemed admitted by Congress into the Union under and by virtue of this act, *on an equal footing with the original States.*" The proclamation has been issued and the Senators and Representatives from the State admitted to their seats in the Congress.

Has Oklahoma been admitted upon an equal footing with the original States? If she has, she by virtue of her jurisdictional sovereignty as such a State may determine for her own people the proper location of the local seat of government. She is not equal in power to them if she cannot.

In *Texas* v. *White,* 7 Wall. 700, 725, Chief Justice Chase said in strong and memorable language that, "the Constitution, in all of its provisions looks to an indestructible Union, composed of indestructible States."

In *Lane County* v. *Oregon,* 7 Wall. 76, he said:

"The people of the United States constitute one nation, under one government, and this government, within the scope of the powers with which it is invested, is supreme. On the other hand, the people of each State compose a State, having its own government, and endowed with all the functions essential to separate and independent existence. The States disunited might continue to exist. Without the States in union there could be no such political body as the United States."

To this we may add that the constitutional equality of the States is essential to the harmonious operation of the scheme upon which the Republic was organized. When that equality disappears we may remain a free people, but the Union will not be the Union of the Constitution.

*Judgment affirmed.*

Mr. Justice McKenna and Mr. Justice Holmes dissent.