STATE EX REL. RECONSTRUCTION FINANCE CORPORATION, Respondent, vs. SANLADER, City Clerk, Appellant.

*April 10—May 13, 1947.*

John C. Doerfer, city attorney, for the appellant.

For the respondent there was a brief by *Shea & Hoyt* of Milwaukee, attorneys, and *Edmund B. Shea* and *Ralph M. Hoyt* of counsel, all of Milwaukee, and oral argument by *Mr. Hoyt* and *Mr. Shea.*

A brief was filed by *James D. Porter,* attorney for the A. O. Smith Corporation, and *James N. Johnson* of counsel, both of Milwaukee, as *amicus curiæ.*

WICKHEM, J. The facts are not in dispute. The Defense Plant Corporation was an instrumentality of the United States government until June 30, 1945, when by joint resolution of congress it was dissolved and its assets transferred to Reconstruction Finance Corporation. On February 25, 1942, Defense Plant Corporation entered into an agreement with Kearney & Trecker Corporation whereby the latter was to acquire two and three-quarters acres of land and to build thereon a manufacturing plant having a productive area of 110,000 square feet. Defense Plant Corporation agreed to finance the acquisition and construction in order to facilitate the manufacturing of milling machines for the government. Under the agreement the real estate and machinery were to be conveyed to Defense Plant Corporation which in turn would lease to the company. This scheme was put into execution. The equipment of the factory largely consisted of presses, drilling machines, cranes, etc., weighing from a half ton to seventy-two tons. These were bolted to a wood-block floor having a concrete subfloor, the bolt being screwed to anchors set in concrete. The screws are capable of being removed so that the machinery could be taken off but the sleeves and anchors are permanently embedded in the concrete floor. Each machine has its own

motor, power being purchased from a public utility.   The
electrical-feeder lines run along the structural members of the
building and are encased in conduits.   In some cases the con-
duit is embedded in the floor of the mezzanine portion of the
building.   There are six or eight cranes weighing about fifteen
tons and the beams supporting the cranes are made heavier than
necessary to support the building in order to accommodate the
weight of the cranes.   The building itself is higher than would
ordinarily be required were it not for the cranes.   The lease
provides : "Title to the site, buildings, and machinery to be ac-
quired hereunder shall, unless and until the same shall be trans-
ferred by Defense Plant Corporation in accordance with the
provisions hereof, be vested in Defense Corporation, and such
machinery shall remain personalty notwithstanding the fact
that it may be affixed or attached to realty."

There is no dispute in the case as to the value, valuation, or
manner of assessment.   Briefly, it is the contention of the Re-
construction Finance Corporation, (1) that the land in ques-
tion was the property of the United States and exempt from
taxation under sec. 2, art. II, constitution of the state of Wis-
consin; (2) that relator's machinery and equipment are spe-
cifically exempt from taxation by sec. 70.11 (1a), Wis. Stats.;
(3) that relator's machinery and equipment are personal
property and their taxation prohibited by sec. 610 of the Re-
construction Finance Corporation Act.

The trial court concluded, (1) that there was nothing in the
constitution of the state of Wisconsin to prevent taxation of
the land and building here involved; (2) that sec. 70.11 (1a),
Wis. Stats., exempted the machinery and equipment from taxa-
tion whether they be considered to be personal property or
not; and that (3) there having been one lump assessment on
land, building, and machinery it is impossible to separate the
items and the whole assessment is void.   There is no contest
upon the latter point and it will receive no further mention.

In order to make respondent's first contention understandable it should be said that the Reconstruction Finance Corporation Act provides that any real property of the corporation shall be subject to state, county, municipal, or local taxation to the same extent according to its value as other real property is taxed. Hence, the United States government has waived its rights to exemption of real property owned by this agency. It is contended by the Reconstruction Finance Corporation, however, that until there is an amendment to sec. 2, art. II, Wis. Const., deleting that portion of the article that provides that no tax shall be imposed on land, the property of the United States, the legislature is without power to impose such tax as it has assumed to do under sec. 70.11, Wis. Stats. Since, as will hereinafter appear from the observations in this opinion, the court considers that the second point of the trial court is well taken it probably is not necessary to discuss the first point. However, both parties join in asking the court to make a determination of the constitutional point because of its importance in many similar situations, and we have determined to respond to the request.

The state of Wisconsin was admitted to the Union by the terms of an enabling act, sec. 7 of which reads as follows:

"Section 7. *Fifth*. . . . *Provided,* That the foregoing propositions herein offered are on the condition that the said convention which shall form the constitution of said state shall provide, by a clause in said constitution, or an ordinance, irrevocable without the consent of the United States, that said state shall never interfere with the primary disposal of the soil within the same by the United States, nor with any regulations congress may find necessary for securing the title in such soil to *bona fide* purchasers thereof; and that no tax shall be imposed on lands the property of the United States. . . ." (9 U. S. Stats. at L. 58.)

The constitutional convention in Wisconsin enacted sec. 2, art. II, Wis. Const., in response thereto. This section reads as follows:

*"Enabling act accepted.* Section 2. The propositions contained in the act of congress are hereby accepted, ratified and confirmed, and shall remain irrevocable without the consent of the United States; and it is hereby ordained that this state shall never interfere with the primary disposal of the soil within the same by the United States, nor with any regulations congress may find necessary for securing the title in such soil to *bona fide* purchasers thereof; and no tax shall be imposed on land the property of the United States; and in no case shall nonresident proprietors be taxed higher than residents. . . ."

Respondent contends that even with the consent of the federal government the legislature of this state has no power to tax lands of the United States or its instrumentalities unless and until sec. 2, art. II, Wis. Const., is amended to revoke the prohibition therein contained. It is urged that neither sec. 2 nor the enabling act to which it seeks to conform conditions the exemption of federal lands upon the consent of the federal government; that the compact or condition, whichever it be called, is that Wisconsin will enact a constitution or ordinance providing for the undertakings enumerated in sec. 7 of the enabling act, and that it is this constitution or ordinance which is irrevocable without the consent of the United States; that since it was insisted in the enabling act that a constitutional provision or ordinance be adopted by the constitutional convention it is implied that it is this that must be revoked by the process of amendment requisite in the case of every constitutional change.

After careful consideration we are of the view that respondent's contention must be rejected. We consider that the proper approach to the question presented by this contention is, (1) to determine the legal background in respect of the power of states to tax federal lands; (2) to ascertain what could have been the objectives of the federal government and a territory seeking admission to statehood in entering into a compact concerning taxation of government lands, if indeed, it is a compact; (3) to determine in the light of applicable legal

rules what limitations there are in respect of the subject matter of the agreement or, to put it another way, what conditions the federal government could impose upon an incoming state; (4) to determine what practical consequences flow from a construction in accordance with respondent's contention.

Having arrived at a conclusion in respect of each of these factors it then becomes proper to see whether the language of sec. 2, art. II, Wis. Const., is open to construction and, if so, whether it will accommodate itself to the conclusions reached. Respondent claims that the sole question is as to the proper construction of sec. 2, art. II, and that none of the other factors have any bearing whatever. We agree that the matters above listed have no relevance except as they bear upon the proper construction to be put upon sec. 2, art. II, and then only if its language leaves it open to construction.

*McCulloch v. Maryland,* 4 Wheat. 316, 4 L. Ed. 579, is generally considered to hold that lands and property of the United States are exempt from taxation by the state in which they are located although a reading of the opinion would seem to raise some question whether it is not limited to a holding that means and instrumentalities employed by the federal government for the execution of its powers are not taxable. In any event, it is said in the opinion that the lands of the Bank of the United States located in Maryland were taxable although the operations of the bank were not. However, the matter was put in issue by the briefs of counsel, and the general opinion of the bar and legal writers was that the opinion had the broader scope above indicated. In *Van Brocklin v. Tennessee,* 117 U. S. 151, 6 Sup. Ct. 670, 29 L. Ed. 845, it was held explicitly that the states had no power to tax federally owned lands. In the opinion in this case it was also stated that enabling acts under which such states as Wisconsin were admitted to the Union are equivalent to each other, are wholly declaratory in character and confer no new right or power upon the United States. It is suggested in 1 Willoughby, 154, that the enabling

acts were the result of misgivings concerning the scope of the holding in *McCulloch v. Maryland, supra.* We deem this of little consequence. In any case the legal effect of an enabling act and its acceptance by any state admitted under it is simply to declare the law as it existed from the time the federal constitution was adopted. Without it, a state could not tax lands of the United States located within its boundaries except with the consent of the United States.

Another principle well established is that set forth in *Coyle v. Smith,* 221 U. S. 559, 31 Sup. Ct. 688, 55 L. Ed. 853. It was there held that when a new state is admitted to the Union it is so admitted with all the powers of sovereignty and jurisdiction which pertain to the original states and that such powers may not be constitutionally diminished, impaired, or shorn away by any conditions, compacts, or stipulations embraced in the act under which the new state came into the Union which would not be valid and effectual if the subject of congressional legislation after admission. Hence, congress could not exact as a condition to statehood that Wisconsin engage not to tax federal lands by a constitutional provision if it meant thereby to require that Wisconsin could not act upon the consent of congress to tax federal lands unless it adopted a constitutional amendment by the procedure requisite to such amendments. To exact this would impede and delay Wisconsin in responding to a consent to tax in a manner that the original thirteen states, and such states as were not admitted by such enabling acts, are not impeded and would be of no force and effect under the doctrine of *Coyle v. Smith, supra.* Hence, it must be assumed, unless the language of the enabling act clearly repels the assumption, that congress did not mean so to limit and proscribe the sovereignty of the state of Wisconsin. The inference is a genuine one since the applicable provisions of the enabling act were inserted out of an abundance of caution, and it cannot be supposed that the design was to do more than to make it clear that lands of the United

States were not without its consent to be taxed by the state. It is true that the enabling acts required that the state respond by a constitutional provision or ordinance. It is to be noted, however, that congress was obviously indifferent as to which form the engagement on the part of the state took so long as it had the assent of the new state by the only method by which a new state could assent. On the other hand, the state of Wisconsin had literally no interest except to make such concessions as were necessary to secure its admission as a state. Indeed, its interest was to tax all the property lying within its boundaries. It had not the slightest motive to refrain from taxing lands of the United States except as it was, (1) compelled to do so by the law of the land; or (2) required to do so by conditions to statehood imposed upon it by the enabling act. Thus, a purpose to refrain from taxing federal lands after getting federal consent until Wisconsin had amended its constitution would exceed any interest the federal government could legitimately be supposed to have and directly contravene interests of the state of Wisconsin. Further than this, to assume that the intention of those who drafted the Wisconsin constitution was as respondent claims would require a much more far-reaching conclusion than that actually contended for by respondent. Respondent concedes that a constitutional amendment would put the legislature in a position to tax federal lands. If, however, the quality of irrevocability without the consent of the United States refers to sec. 2, art. II, Wis. Const., the latter can be revised only in response to federal consent, and a mere permission by congress that certain lands be taxed would not suffice. This would clearly violate the principle laid down in *Coyle v. Smith*. Further than this, it would make it impossible for Wisconsin to adopt any procedure to take advantage of such limited consents as are involved in this case. We have not been informed that there has been any general consent by congress to tax the public domain. We understand that there has been a specific consent for states to

tax lands of the Reconstruction Finance Corporation and perhaps similar consents as to other corporations used as instrumentalities of the federal government. If the enabling acts and sec. 2, art. II, mean what respondent asserts we do not see how advantage may be taken of the consent by any constitutional amendment that could be passed by the people of Wisconsin. The construction offers difficulties in another respect. In respondent's construction there would appear to be no way to meet a situation where congress first gave and later withdrew its consent to tax federal lands. Did the state impose a duty upon itself to respond to partial temporary consents or withdrawals of consent that federal lands be taxed by appropriate constitutional amendments? We shall not attempt a solution, and simply assert the unlikelihood that the state of Wisconsin intended to become involved in such complications.

The foregoing leads us to the conclusions, (1) that the enabling acts are merely declaratory of a rule that a state may not without federal consent tax lands owned by the United States; (2) that these acts were founded in caution and meant to do no more than secure by compact what the law required in any event; (3) that the state of Wisconsin had no motive for going any further with its constitutional provisions than was necessary to meet the conditions imposed by congress; (4) that the rule contended for by respondent would make it impossible for the state of Wisconsin, even by constitutional amendment, to tax lands of the United States or its instrumentalities.

It is not denied that all of the foregoing are simply materials for construction; that if the constitutional provision of sec. 2, art. II, Wis. Const., are not ambiguous we cannot apply rules of construction and that ambiguous or not we cannot by a consideration of such factors reach a construction to which language of sec. 2, art. II, will not accommodate itself.

We now proceed to an examination of the provisions of the enabling act and those of sec. 2, art. II, Wis. Const. Sec. 7 of the enabling act contains a master clause and five subdivisions

denominated "propositions." The master clause recites that five *propositions* are submitted to the constitutional convention for the state of Wisconsin for acceptance.or rejection and if accepted and ratified by an article the constitution of Wisconsin shall be obligatory on the United States. ˙The first grants section 16 in every township to the state for the use of schools. The second grants land for the use and maintenance of the university. The third makes a grant of land for public buildings and the seat of government; the fourth makes a grant to the state of salt springs within the state, together with six sections of land adjoining. The fifth provides that five per cent of the net proceeds of sales of all public lands lying within the state which have been or shall be sold by congress after the admission of Wisconsin to the Union shall be paid to the state for the purpose of making public roads or canals. These five propositions are followed by a proviso denominated in the margin of the act "condition." This is quoted in the earlier portion of the opinion and the controversy here relates in part to its construction.

It will, of course, at once be perceived that the language of the condition gives considerable color to the argument that all of the propositions contained in sec. 7 of the enabling act are conditioned upon adoption of a clause in the constitution of Wisconsin irrevocable without the consent of congress engaging *inter alia* that the state will not tax lands the property of the United States and that the "consent of the United States" goes to the revocation of such clause and not to any of the particular items required to be included within it. If that meaning be accepted an ambiguity arises out of the statement in sec. 2, art. II, Wis. Const., that "the propositions contained in the act of congress are hereby accepted, ratified and confirmed, and shall remain irrevocable without the consent of the United States." If the section solely meant to accept the five *propositions* contained in sec. 7 of the enabling act the words "irrevocable without the consent of the United States" are wholly inapplicable.

If, however, it meant also to accept the conditions detailed in the enabling act and listed after a semicolon in the same sentence the term relating to irrevocability without the consent of the United States has sense and application. Since the enactment of the clause was a satisfaction of the requirement that the propositions of the enabling act be accepted by constitutional provision we think it was the purpose of sec. 2, art. II, although ineptly stated, to engage not to do any of the things specified in the same sentence following the semicolon without the consent of the United States. This is a permissible construction and should be adopted in view of the surrounding circumstances and factors that have heretofore been discussed.

We are fortified in our conclusion by the fact that the constitution nowhere puts any specific limitation upon the powers of the legislature in accordance with the undertakings of sec. 2, art. II, Wis. Const., and we consider that this points to an intention that the legislative power in this respect was restrained only for the purpose of the compact arising out of the enabling act and then only until consent to tax was given by the United States.

We conclude that without amending sec. 2, art. II, Wis. Const., Wisconsin may impose a tax upon lands of the United States provided congress consents to such a tax. Such was the conclusion of the supreme court of Washington in *Boeing Aircraft Co. v. Reconstruction Finance Corp.* 25 Wash. (2d) 652, 171 Pac. (2d) 838, involving an enabling act and constitutional provision which we do not consider importantly different from those involved here.

Appellant's next contention is that respondent's machinery and equipment constitute fixtures and a part of the real estate under the law of Wisconsin; that they are taxable under the consent in sec. 610 of Reconstruction Finance Corporation Act, 15 USCA, and that they are not exempted by sec. 70.11 (1a), Wis. Stats., sec. 610 of the Reconstruction Finance Corporation Act provides :

"Any real property of the corporation shall be subject to state, territorial, county, municipal, or local taxation to the same extent according to its value as other real property is taxed."

In *Reconstruction Finance Corp. v. Beaver County*, 328 U. S. 204, 66 Sup. Ct. 992, 90 L. Ed. 1172, it was held by the supreme court of the United States that the meaning of real property in sec. 610, of the Reconstruction Finance Corporation Act, is to be ascertained by the application of settled state rules as to what constitutes property so long as such rules do not affect a discrimination against the federal government or patently run counter to the terms of the act. It was held that machinery and equipment which were a part of the real property under the law of Pennsylvania could be taxed under the provisions of sec. 610. This case is clear enough authority for Wisconsin to tax machinery and equipment which are a part of the real estate according to the law of Wisconsin. In view, however, of the provisions of sec. 70.11 (1a), Wis. Stats., we think that appellant is not in a position to take advantage of the ruling in the *Beaver County Case*. Sec. 70.11 (1a) reads as follows:

"(1a) The exemption provided by subsection (1) shall not include real property subject to taxation under any federal statute applicable thereto, but such exemption shall extend to and include all machinery and equipment owned exclusively by the United States or any corporate agency or instrumentality thereof until such time as the congress of the United States shall expressly authorize the taxation of such machinery and equipment."

The provision in sec. 70.11 (1a), Wis. Stats., that the exemption provided by sub. (1) (exempting lands the property of the United States) "shall not include real property subject to taxation under any federal statute applicable thereto," standing alone, would furnish considerable basis for appellant's argument. The subsection goes on, however, to provide that

the exemption "shall extend to and include *all machinery and equipment* . . . until such time as the congress of the United States shall expressly authorize the taxation of such machinery and equipment." The specific reference to machinery and equipment makes the legislative purpose and the scope of the exemption too clear for construction. The exemption would have been of personal property generally if the legislature had meant to include fixtures with real estate. It is apparent that the legislature took no chances on mixing the void with the valid and only went so far in imposing a tax as it could go with safety. Sec. 70.11 (1a) went into effect in 1943 and the *Beaver County Case, supra,* was not announced until 1946. It is apparent that doubts as to the extent of its power led the legislature specifically to exempt machinery and equipment without taking into account the possibility that they might be held taxable as real estate.

We conclude that in the present state of our own statutes the trial court correctly held that machinery and equipment were not subject to assessment. This conclusion makes it unnecessary to examine appellant's contention that the character and method of affixing to the real estate made this machinery and equipment a part of the real estate. It is not necessary to discuss respondent's contention that the machinery and equipment are personal property by reason of the fact that they are so characterized in the lease.

It is finally claimed that the machinery and equipment were not owned exclusively by the United States and are hence not within the exemption because they were leased to a third party with an option to the latter to purchase at the termination of the lease. The idea that one who has the complete legal and equitable title to property is not its exclusive owner when he has leased it to another or given another an option to purchase it appears to us to be unsound but we shall not attempt to labor this point. The term "exclusive" is a statutory term and not a word of art in connection with estates in real property and

the question is what this statute means. It is perfectly obvious that it was passed to deal with situations arising out of the financing, leasing, or otherwise furnishing machinery and equipment to private plants to produce products necessary for the national defense. It meant to exempt such machinery and equipment under those arrangements as are owned by the United States even though leased or bailed to a private factory for the carrying out of governmental objectives. The situation which aroused the legislation involves the possession of machinery and equipment by a private plant, and it was never contemplated by the legislature that this aspect would destroy the exclusive quality of the government ownership. So to assume would limit the operation of the section to plants owned and operated by the United States government whereas the section as a whole, including that portion which removes the exemption as to real estate, indicates that it was concerned with real property, machinery, and equipment owned by such instrumentalities as the Reconstruction Finance Corporation and which it is common knowledge were in the possession of private plants in connection with some sort of agreement for the purpose of producing products necessary for the public defense.

*By the Court.*—Judgment affirmed.

BARLOW, J., took no part.