The Attorney General is in receipt of your request for an Opinion wherein you ask inter alia the following question: Is the State of Oklahoma, as an employer, compelled to comply with the newly enacted provisions of Public Law95-555, 92 Stat. 2076 Senate Bill 995 amending Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e? By way of background, the equal employment opportunities provisions of the Civil Rights Act of 1964, codified as42 U.S.C. § 2000e et seq. is commonly referred to as "Title VII" of the Act. Title VII declared inter alia that discrimination on the basis of sex by an employer against an employee with respect to compensation, terms, conditions and privileges of employment was an unlawful employment practice. Therefore, the threshold question to be confronted whether the State of Oklahoma is subject to Title VII, 701(k). When originally enacted, the provisions of Title VII exempted States or political subdivisions thereof in their respective capacities as "employers" as defined. Pub.L. 88-352, 78 Stat. 253
701(b). Effective March 24, 1972, however, Title VII was amended by Pub.L. 92-261. The amendments deleted "States or political subdivisions thereof" from those employers exempt from the provisions of Title VII. Your inquiry was prompted by a further amendment to the Civil Rights Act by the passage of Pub.L. 95-555, 92 Stat. 2076 on October 31, 1978, wherein subsection (k) was added to 701. For convenience, subsection (k) is quoted as follows: "(k) The terms 'because of sex' or 'on the basis of sex' include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work, and nothing in section 703(h) of this title shall be interpreted to permit otherwise." No authority need be cited for the fundamental and well-settled proposition that an Act of Congress must find its authority within the framework of the United States Constitution. TheTenth Amendment recognized that principle of power, but additionally acknowledges the residual sovereignty of the States: "The powers not delegated to the United States by the Constitution, nor prohibited it to the States, are reserved to the States respectively, or to the people." Two potential sources of congressional authority to include the State of Oklahoma within the purview of Title VII, 701(k) are considered to exist; the Commerce Clause, U.S. Const. art. 1, Section 8, cl. 3 : "To regulate Commerce with foreign Nations, and among the several States, and with the Indian tribes; * * * *" and theFourteenth Amendment to the Constitution (in pertinent part): "Section 1. All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws. "Section 5. The Congress shall have power to enforce, by appropriate legislation, the provisions of this article." Neither source of congressional authority is believed to be legally sufficient to require the inclusion of the State of Oklahoma within the scope of Title VII, 701 (k). In a case strikingly similar on its facts, the United States Supreme Court, in Geduldig v. Aiello, 417 U.S. 484,41 L.Ed.2d 256, 94 S.Ct. 2485 (1974), held that a disability insurance system administered by the State of California for the benefit of premium-paying citizens for the purpose of insurance against risks of temporary disability stemming from illness or injury, but excluding disability "caused by or arising in connection with pregnancy," was not invalid under the Equal Protection Clause of theFourteenth Amendment. Stated the Court, commencing at417 U.S. 494: "* * * The essential issue in this case is whether the Equal Protection Clause requires such policies to be sacrificed or compromised in order to finance the payment of benefits to those whose disability is attributable to normal pregnancy and delivery. "We cannot agree that the exclusion of this disability from coverage amounts to invidious discrimination under the Equal Protection Clause." Continuing at 417 U.S. 496, 497, the Court reasoned: These insurance policies provide an objective and wholly noninvidious basis for the State's decision not to create a more comprehensive insurance program than it has. There is no evidence in the record that the selection of the risks insured by the program worked to discriminate against any definable group or class in terms of the aggregate risk protection derived by that group or class from the program. There is no risk from which men are protected 417 U.S. 497
and women are not. Likewise, there is no risk from which women are protected and men are not. The Geduldig case and the later General Electric Co. v. Gilbert, 429 U.S. 125,50 L.Ed.2d 343, 97 S.Ct. 401 (1976) permit a fundamental basis upon which to conclude that Oklahoma's State employee health plan, even if providing lesser benefits for maternity-related medical expenses, is not violative of the Equal Protection Clause of theFourteenth Amendment. Further, the U.S. Supreme Court, in National League of Cities v. Usery, 426 U.S. 833, 49 L.Ed.2d 245,96 S.Ct. 2465 (1976) declared, in summary, that States and political subdivisions thereof in their sovereign capacity were not subject to the provisions of minimum wage and maximum hour requirements of the Fair Labor Standards Act (hereafter "FLA"). As in the Civil Rights Act with which we are presently concerned, Congress, by a 1974 amendment, extended the provisions of FLA to include virtually all employees of the States and political subdivisions. As here, Congress exercised its power to do so under the provisions of the Commerce Clause, generally held to be the source of plenary power for the governance of commerce within the United States. No challenge to congressional authority to exercise its power over private employers was made in National League of Cities, supra, but the League contended: ". . . that when Congress seeks to regulate directly the activities of States as public employers, it transgresses an affirmative limitation on the exercise of its power akin to other commerce power affirmative limitations contained in the Constitution. "Appellants' essential contention is that the 1974 amendments to the Act, while undoubtedly within the scope of the Commerce Clause, encounter a similar constitutional barrier because they are to be applied directly to the States and subdivisions of States as employers." 426 U.S. 841
Adopting those contentions, the Court said at 426 U.S. 842: "This Court has never doubted that there are limits upon the power of Congress to override state sovereignty, even when exercising its otherwise plenary powers to tax or to regulate commerce which are conferred by Art. I of the Constitution." Continuing at 426 U.S. 845, the Court said: "It is one thing to recognize the authority of Congress to enact laws regulating individual businesses necessarily subject to the dual sovereignty of the government of the Nation and of the State in which they reside. It is quite another to uphold a similar exercise of congressional authority directed, not to private citizens, but to the States as States. We have repeatedly recognized that there are attributes of sovereignty attaching to every state government which may not be impaired by Congress, not because Congress may lack an affirmative grant of legislative authority to reach the matter, but because the Constitution prohibits it from exercising the authority in that manner. "One undoubted attribute of state sovereignty is the States' power to determine the wages which shall be paid to those whom they employ in order to carry out their governmental functions, what hours those persons will work, and what compensation will be provided where these employees may be called upon to work overtime. The question we must resolve here, then, is whether these determinations are "functions essential to separate and independent existence," ' citing Coyle v. Oklahoma, 221 U.S. 559 at 580, 55 L.Ed. 853,31 S.Ct. 688 at 695 . . . so that Congress at 426 U.S. 846 may not abrogate the States' otherwise plenary authority to make them." Stating that imposition of the wage and hour provisions would "impermissibly interfere with integral governmental functions" of the States, the Court continued by finding that the application of the F.L.A. would "significantly alter or displace the States' abilities to structure employer-employee relationships" in services performed by the States and their local governments "in discharging their dual functions of administering the public law and furnishing public services." 426 U.S. 851. "Thus, even if appellants may have over-estimated the effect which the Act will have upon 426 U.S. 852 their current levels and patterns of governmental activity, the dispositive factor is that Congress has attempted to exercise its Commerce Clause authority to prescribe minimum wages and maximum hours to be paid by the States in their capacities as sovereign governments. In so doing, Congress has sought to wield its power in a fashion that would impair the States' 'ability to function effectively in a federal system.' Citation omitted This exercise of congressional authority does not comport with the federal system of government embodied in the Constitution. We hold that insofar as the challenged amendments operate to directly displace the States' freedom to structure integral operations in areas of traditional governmental functions, they are not within the authority granted to Congress by Art. I, Section 8, cl.3." No rational distinction can be seen or drawn between the amount of compensation paid in the form of wages and salaries directly to the California state employees with which National League of Cities, supra, was concerned and compensation in the form of a non-contributory group insurance plan authorized by Oklahoma Statutes. Oklahoma, as a State, "stand s on a quite different footing from an individual or a corporation when challenging the exercise of Congress' power to regulate commerce." 426 U.S. 854. By reason of the disposition to be made of your initial question, it is unnecessary to recite or review your subsequent questions. Lest this opinion be construed or applied beyond its limited scope, however, it must be stated that this opinion applies and is only intended to apply to the requirement of the State of Oklahoma to comply with Title VII, 701 (k) enacted as Public Law95-555, 92 Stat. 2076 passed by the Congress on October 31, 1978. It is neither necessary nor appropriate to consider other provisions of Title VII, 701. It is, therefore, the opinion of the Attorney General that the provisions of Title VII, 701(k) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, are not constitutionally applicable to the State of Oklahoma and its political subdivisions and the State, as an employer, is not bound to comply with the provisions of subsection (k) with respect to its employees group health insurance plan. (MANVILLE T. BUFORD) (JOHN F. PERCIVAL) (ksg) ** SEE: OPINION NO. 79-122 (1979) ** ** SEE: OPINION NO. 79-153 (1979) **