Russell HOBBS, Appellant,

v.

STATE of Alaska, Appellee.

No. 4.

Supreme Court of Alaska.

Feb. 11, 1961.

Wendell P. Kay, Anchorage, Alaska, for appellant.

Theodore M. Pease, Jr., Anchorage, Alaska, for appellee.

Before NESBETT, C. J., and DIMOND and AREND, JJ.

NESBETT, Chief Justice.

█ The question first to be determined is whether the United States District Court for the District (Territory) of Alaska, acting as an interim transition court for the period between the admission of Alaska into the Union and the organization of its constitutional courts, had jurisdiction to try the appellant for larceny.

Appellant was indicted on October 27, 1958, for larceny in a building, which was not a federal offense. Alaska was admitted into the Union on January 3, 1959. Appellant was tried and convicted in the interim transition court and on March 17, 1959, was sentenced by that court to serve five years with two years suspended. The Supreme Court of Alaska assumed its jurisdiction on October 5, 1959. The remainder of the state courts assumed their exclusive jurisdiction on February 20, 1960. The newly created United States District Court for the District of Alaska assumed its exclusively federal jurisdiction on February 20, 1960 and the interim United States District Court for the District (Territory) of Alaska,[1] which had exercised both federal and

---

1. The Act of May 17, 1884, 23 Stat. 24, established the court of general jurisdiction for the Territory of Alaska as the "District Court for the District of Alaska"; the Act of June 6, 1900, 31 Stat. 443 in restating the Act of May 17, 1884 used the same title. That court has also been designated as the "District Court for the Territory of Alaska" in 28 U.S. C.A. § 1291 and other sections. Both titles have been used interchangeably in Alaska practice. The Alaska Statehood Act, §§ 12–18, 72 Stat. 344–350 (1958), 48 U.S.C.A. preceding § 21, refers to it as the "District Court for the Territory of Alaska," and retains the same title for the transition court provided for in that act. In S.L.A.1959, ch. 50, §§ 31 (2), 32(4) the transitional court is referred to by the title "District Court of the State of Alaska," but in S.L.A.1959, ch. 151, amending S.L.A.1959, ch. 50, § 32 (4), the same court is referred to by the title "District Court of the District of Alaska." The title "District Court for the District (Territory) of Alaska" will

state jurisdiction, went out of existence on that date.

■ Appellant contends that the interim transition court was imposed on the State of Alaska by Congress in violation of its right to be admitted on an equal footing with all other states of the Union, a right carefully protected by a series of United States Supreme Court decisions.[2]

To consider appellant's contention in perspective, pertinent acts of Alaska and the Congress of the United States must be reviewed. Prior to the admission of Alaska into the Union and since 1884 [3] the court of general jurisdiction in Alaska was the United States District Court for the District (Territory) of Alaska. Its judges were appointed for terms of four years and it exercised both federal and territorial jurisdiction.

In order to provide for an orderly court transition at such time as Alaska should attain statehood, the Alaska Constitutional Convention, on February 5, 1956, adopted the present constitution. Section 17 of Article XV of the constitution states that until the courts provided for in the constitution are organized "the courts, their jurisdiction, and the judicial system shall remain as constituted on the date of admission unless otherwise provided by law".[4] The constitution was ratified by the voters of Alaska on April 24, 1956.

On July 7, 1958, Congress "accepted, ratified, and confirmed" the Constitution of Alaska and made detailed provisions for Alaska's admission as a state,[5] which happened on January 3, 1959 by Presidential Proclamation.[6] With respect to the transfer of court functions, the Statehood Act provided for the continuation of suits, prosecution of appeals, transfer of cases and succession of courts, outlining in adequate detail an arrangement whereby the United States District Court for the District (Territory) of Alaska could serve as an interim court with jurisdiction over both federal and state matters, just as it had been doing prior to statehood.[7] The Act also provided that the United States Court of Appeals for the Ninth Circuit should act as an interim appellate court for the interim United States District Court for the District (Territory) of Alaska. Section 18 of this enabling legislation provided:

"Sec. 18. The provisions of the preceding sections with respect to the termination of the jurisdiction of the District Court for the Territory . of Alaska, the continuation of suits, the succession of courts, and the satisfaction of rights of litigants in suits before such courts, shall not be effective until three years after the effective date of this Act, unless the President, by Executive order, shall sooner

be used in this opinion to designate both the territorial court existing prior to statehood and the transition court remaining after statehood.

2. Pollard v. Hagan, 1845, 44 U.S. 212, 11 L.Ed. 565; Benner v. Porter, 1850, 50 U.S. 235, 13 L.Ed. 119; Forsythe v. United States, 1850, 50 U.S. 571, 13 L.Ed. 262; Coyle v. Smith, 1850, 221 U.S. 559, 31 S.Ct. 688, 55 L.Ed. 853.

3. Act of May 17, 1884, 23 Stat. 24.

4. Art. XV, § 17 of the Alaska Constitution provides:
"Section 17. Until the courts provided for in Article IV are organized, the courts, their jurisdiction, and the judicial system shall remain as constituted on the date of admission unless otherwise provided by law. When the state courts

are organized, new actions shall be commenced and filed therein, and all causes, other than those under the jurisdiction of the United States, pending in the courts existing on the date of admission, shall be transferred to the proper state court as though commenced, filed, or lodged in those courts in the first instance, except as otherwise provided by law."

5. Alaska Statehood Act, § 1, 72 Stat. 339 (1958), 48 U.S.C.A. preceding § 21.

6. Exec.Proclamation No. 3269, 24 Fed. Reg. 81 (1959), 48 U.S.C.A. preceding § 21 note; Alaska Statehood Act, § 8(c), 72 Stat. 344 (1958), 48 U.S.C.A. preceding § 21.

7. Alaska Statehood Act, §§ 13–17, 72 Stat. 339 (1958), 48 U.S.C.A. preceding § 21.

proclaim that the United States District Court for the District of Alaska, established in accordance with the provisions of this Act, is prepared to assume the functions imposed upon it. During such period of three years or until such Executive order is issued, the United States District Court for the Territory of Alaska shall continue to function as heretofore. The tenure of the judges, the United States attorneys, marshals, and other officers of the United States District Court for the Territory of Alaska shall terminate at such time as that court shall cease to function as provided in this section."

Section 12 of the Statehood Act was devoted to conforming various titles of the United States Code to the changes that would result from statehood. This was done by adding sections and striking words and sections so the titles would read as intended after the Act became effective and Alaska had become a state. Section 12(e) provided that the words "the District Court for the Territory of Alaska" be stricken wherever they might appear in many enumerated sections of the titles. Unfortunately, title 28 section 1291 was listed. This section provided that the United States Courts of Appeal should "have jurisdiction of appeals from all final decisions of the district courts of the United States, [and] the District Court for the Territory of Alaska * * *." The elimination in section 12(e) of the United States Courts of Appeal as the appellate court for the United States District Court for the District (Territory) of Alaska was

exactly contrary to the expressed intent of sections 13–18, particularly section 14, of the act, that it was to remain as such appellate court during the transition period. The significance of this contradiction will be mentioned later.

Immediately after Alaska attained statehood the first state legislature enacted a law providing for the creation of the supreme and superior courts, which law became effective on March 19, 1959.[8] The intent of this legislation was expressed in section 32 as follows:

"It is the intent of the Legislature by the passage of this Act * * * to provide for the organization of the State courts in an orderly manner so that the same will be completed on or before January 3, 1962 and so that during the intervening period advantage may be taken of the district and appellate structure referred to in Public Law 508, 85th Congress." [Alaska Statehood Act.]

Section 31 of the act provided that the state courts should be deemed organized for the purpose of transferring causes on January 3, 1962; that causes could be commenced and determined as soon as judges were appointed; that their jurisdiction should be exclusive after January 3, 1962 and non-exclusive prior to that date.[9]

Thus it is apparent that as of March 19, 1959, the effective date of the above act, both Congress and the Alaska Legislature contemplated an orderly court transition using the United States District Court for

8. S.L.A.1959, ch. 50 [A.C.L.A. Tit. 52A, ch. 1 (Cum.Supp.1959)].

9. S.L.A.1959, ch. 50, § 31 [A.C.L.A. § 52A-1-31 (Cum.Supp.1959)] states:
 "(1) The State courts shall be deemed organized for the purpose of transferring causes as provided in Section 17, Article XV of the Constitution of the State of Alaska, on the 3rd day of January, 1962. Provided, however, that causes may be commenced, filed and determined in the State courts in each judicial district at

the time of the appointment of one or more judges for such district.
 "(2) The jurisdiction of the courts of the State in this Act * * * provided shall be exclusive from and after the 3rd day of January, 1962 but prior to that date shall be non-exclusive, and nothing in this Act shall diminish or deprive the District Court of the State of Alaska or the Court of Appeals or the Supreme Court of the United States of jurisdiction as provided by Pub[l]ic Law 508, 85th Congress, and other laws applicable thereto."

the District (Territory) of Alaska and the Court of Appeals for the Ninth Circuit as interim courts, the transfer of causes to be completed at the latest by January 3, 1962.

The possible effect of the contradiction between sections 12(e) and 13 through 18 of the Statehood Act then became apparent. On the 3rd day of March 1959 the case of Parker v. McCarrey,[10] questioning the jurisdiction of the Court of Appeals for the Ninth Circuit to hear appeals from Alaska, was lodged with that court. Anticipating the decision of the Ninth Circuit, the Alaska Legislature, before adjournment, enacted an amendment to its prior act providing for creation of the supreme and superior courts, which amendment stated:

> "In the event that a court of competent jurisdiction, by final judgment, declares that the United States Court of Appeals for the Ninth Circuit lacks jurisdiction to hear appeals from the District Court of the District of Alaska, the Judicial Council shall forthwith meet and submit to the Governor the names of the persons nominated as justices of the supreme court and appeals from the District Court of the District of Alaska may be made to the State Supreme Court. If, upon the occurrence of any of the events set forth in this subsection, the members of the first Judicial Council have not been appointed, the Governor shall forthwith fill the initial vacancies." [11]

Parker v. McCarrey [12] was decided on June 16, 1959 and held that the appellate jurisdiction of the Court of Appeals for the Ninth Circuit over the United States District Court for the District (Territory) of Alaska no longer existed. The Governor and the Judicial Council of Alaska acted with dispatch as directed by the mentioned amendment. The Supreme Court of Alaska was organized and promulgated its rules of appellate practice to become effective October 5, 1959. Appellant's pending appeal with the Ninth Circuit Court of Appeals was dismissed on October 3, 1959 for lack of jurisdiction and appellant's notice of appeal to this court was filed on October 8, 1959.

In the light of the foregoing we now consider appellant's claim that the interim court was imposed on Alaska in violation of its right to be admitted to the Union on an equal footing with all other states.

It is our view that in providing in the Alaska Constitution that the interim courts "shall remain as constituted on the date of admission" a desire was expressed by Alaska to make use of the existing federal court facilities. It can be interpreted in no other light. The existing court facilities were strictly a federal creation entirely under the control of and supported by the United States. The Constitutional Convention is presumed to have been well aware of this fact. In enacting enabling legislation over two years after the Alaska Constitution had been adopted, Congress responded to the desire expressed in the constitution. It "accepted, ratified, and confirmed" the Alaska Constitution and proceeded to make detailed provisions for the use of the existing court system by both the state and the United States.[13]

These facts bear small resemblance to the Benner v. Porter [14] situation where the federal jurisdiction of the interim court was being questioned. In Coyle v. Smith [15] the requirement that the capitol be temporarily retained at Guthrie, Oklahoma was made by Congress itself in the enabling act and was not the result of a previous proposal from the state.[16] There

---

. 9 Cir., 1959, 268 F.2d 907.

. S.L.A.1959, ch. 151, § 1 [A.C.L.A. § 52A–1–32(4) (Cum.Supp.1959)].

. 9 Cir., 1959, 268 F.2d 907.

. Alaska Statehood Act, 72 Stat. 339 (1958), 48 U.S.C.A. preceding § 21.

. 1850, 50 U.S. 235, 13 L.Ed. 119.

. 1911, 221 U.S. 559, 31 S.Ct. 688, 55 L. Ed. 853.

. Id., 221 U.S. at pages 563–564, 31 S. Ct. at page 689, 55 L.Ed. at page 857.

was no reluctance on the part of the State of Alaska to make use of the interim courts provided by the Statehood Act. On the contrary, the State of Alaska, in its constitution, was the first to propose such use. After Congress had accepted the proposal and passed the Statehood Act providing for joint use of the courts during the interim, the Alaska Legislature ratified the methods proposed and enacted the necessary state legislation to permit state cooperation.

■ Appellant argues, however, that the offer or proposal of Alaska was to use the complete judicial system as it then existed; that this proposal was rejected because Congress failed to provide for appellate supervision of the interim courts, to the prejudice of the citizens of Alaska, including appellant. Appellant claims that loss of appellate supervision was a violation of the doctrine of Griffin v. People of the State of Illinois.[17] In that case it was held to be a violation of the fourteenth amendment to deny appellate review solely on account of a defendant's inability to pay for a transcript.

There appears to be no question but that appellate jurisdiction for the interim courts was eliminated by inadvertence. No other explanation is logical. A single reading of sections 12 through 18 of the Statehood Act makes it plain enough that Congress would not intentionally have removed the jurisdiction of United States Courts of Appeal over the United States District Court for the District (Territory) of Alaska in section 12(e) and then proceeded to make detailed provision for the continuation and use of such appellate jurisdiction in the sections immediately following. Since it was not intentionally

done, the effect could not be considered as a rejection of Alaska's constitutional proposal, at least, not unless Alaska itself so considered it. As soon as Alaska learned that interim appellate jurisdiction was in doubt, it immediately enacted legislation to provide for an earlier organization of the Supreme Court of Alaska than had been anticipated in order to fill the void.[18] There is nothing on which to base an inference that the Alaska Legislature considered the loss of interim appellate jurisdiction as a rejection of the constitutional proposal. That body's policy, which is quite evident from its acts, was to make the best of the situation by using the already existing interim courts of general state jurisdiction and provide its own interim appellate court. Within 45 days after the decision in Parker v. McCarrey [19] the Alaska Judicial Council had met and the Governor had appointed the justices of the supreme court. On October 5, 1959 this court promulgated its rules of practice. Rights of appeal accruing during the interregnum were protected by these rules.[20] Appellant was not discriminated against by any act of the State of Alaska under the holding of Griffin v. People of the State of Illinois. The state immediately took action to provide the lost appellate supervision, but in any event appellant was in no different situation than any other appellant in the State of Alaska. It can hardly be argued that inadvertence in draftsmanship was a violation by Congress of appellant's right to equal protection and due process. Congress was under no strict obligation to furnish Alaska an appellate court. It obviously in good faith intended to do so, but failed. The only disadvantage resulting was to the State of

17. 1956, 351 U.S. 12, 18, 76 S.Ct. 585, 100 L.Ed. 891, 898.

18. S.L.A.1959, ch. 151 [A.C.L.A. § 52A–1–32(4) (Cum.Supp.1959)].

19. 9 Cir., 1959, 268 F.2d 907.

20. Supreme Ct.R. 54, as amended, provides:
"(a) Appeals From District Court. These rules shall be applicable to appeals

from the District Court of the District of Alaska which may be allowed in accordance with the provisions of Section 32(4) of Chapter 50 SLA 1959, as amended by Chapter 151 SLA 1959.
"(b) Time for Filing Notice of Appeal. As to judgments entered prior to October 5, 1959, the time for filing a notice of appeal will commence to run from that date instead of the effective date of the judgment."

Alaska in being required to organize immediately a court it had intended to establish at greater convenience.

■ There is no merit to the contention that Congress rejected Alaska's proposal to use the interim courts until its own were organized, by summarily requiring that such courts were to remain in use for three years, unless the President should sooner proclaim that the United States District Court for the District of Alaska was prepared to assume its functions.[21]

■ In taking the lead suggested by Alaska itself in its constitution, Congress quite properly set a time limitation on the existence of the interim courts. Three years after the effective date of the Statehood Act was ample and not unreasonable. This was primarily for the convenience of Alaska, to permit an orderly unhurried organization of its courts. No such length of time would have been required if the only consideration had been that of organizing the new federal court. Provision was made whereby the transition could be accelerated by Presidential proclamation, upon a finding that the newly organized federal court was ready to function. This was not an arbitrary reservation by Congress to the President of the power of determining when the newly organized state courts could assume jurisdiction. Nor was it so regarded by the Alaska Legislature. That body specifically adopted the three year period suggested by Congress as the limit of duration of the interim courts. At the same time it provided that its newly organized courts would commence to assume concurrent jurisdiction with the interim courts immediately upon the appointment of judges.[22] The acceleration provision merely placed power in some person to effect the simultaneous transfer of causes and jurisdictions sooner than the three years provided for by both parties should it become desirable to do so. The

President was the logical official to proclaim the transition because a vital part of the procedure was to terminate the existence of an entire system of interim courts which were a federal creation and to declare the existence of the new federal court. Events have proven that the acceleration provision was a wise one. An early transition became desirable because of the before mentioned circumstances. Alaska and the United States therefore planned accordingly. Through the cooperation of both sovereigns the transition and transfer of causes was effected in a completely satisfactory manner fully two and one half years earlier than either had originally planned.

Although urged to do so, we are not under these facts required to determine the issue that could have arisen had the state desired to terminate the concurrent jurisdiction provided for in the Statehood Act and in its own acts, sooner than January 3, 1962, with the President declining to issue the Proclamation.

None of the authorities cited in the briefs are entirely in point. This is understandable. A study of sections 13–18 of the Statehood Act reveals a studied attempt to avoid the difficulties pointed up by the cases cited.

We hold that the United States District Court for the District (Territory) of Alaska was the interim court of general jurisdiction contemplated by article XV, section 17 of the Alaska Constitution and was available and clothed with jurisdiction of state matters on the effective date of the Statehood Act. Such state jurisdiction was confirmed and defined by the first State Legislature immediately thereafter. The brief interregnum in appellate jurisdiction was terminated by action of the state without prejudice to the rights of appellant.

The next question for decision is whether the trial court erred in permitting the

---

21. Alaska Statehood Act, § 18, 72 Stat. 350 (1958), quoted page 5 supra.

22. S.L.A.1959, ch. 50, § 31, as amended, S.L.A.1959, ch. 151 [A.C.L.A. § 52A–1–31 (Cum.Supp.1959)], quoted note 9 supra.

government to question one of its witnesses at considerable length concerning the contents of a written statement which was inconsistent with the witness's testimony at the trial.

The theory of the government's case was that appellant, Paul Boyer and Dale Best had entered an Anchorage garage building on Sunday, July 13, 1958 and stolen tires and wheels of a value of at least $189 as well as other equipment. Appellant was convicted and co-defendant Boyer acquitted by a jury. The government called Mrs. June Avery as its first witness. Early in the questioning Mrs. Avery was asked whether she had been with appellant, Boyer and Best on July 13 of 1958. The witness refused to answer on the ground that it might incriminate her. The jury was excused and in response to questions put by the United States Attorney, Mrs. Avery stated that she did not take part with appellant, Boyer and Best in the stealing of goods on July 13th and that she did not accompany them to the building. The United States Attorney stated to the court that the answer was a surprise, "however, if that is her answer it could in no way tend to incriminate". The court so ruled, the jury was recalled and Mrs. Avery was ordered by the court to answer. Then in response to questions the witness testified that appellant had driven her to work about 11:15 A.M. on Sunday, July 13th, that she was living with appellant, that she did not see him again that day or for two or three days, that when he returned he said he had been fishing. The following then took place:

"Q. [U. S. Attorney] Mrs. Avery, did you on the 30th day of December, 1958, in my office down here in the Federal Building, in the presence of Lt. Earl Hibpshman, of the City Police Department, and Mr. Dankworth, of the Territorial Police Department, did you not make a statement concerning this case? A. I was drunk and mad at the time and I don't remember what I said.

"Q. And do you remember going to the Commissioner's office on the 30th day of December 1958, and swearing to that statement? A. No, I do not.

"Q. Would you look at the last page of what I am handing you. Do you recognize that? A. As I told you, I was drunk that day. I had been drunk all night and I had had a fight the night before and I don't remember what happened.

"Q. Do you recognize that?"

Over objection that the government was attempting to impeach its own witness the court granted the government's request for the privilege of questioning as upon cross examination because the witness was hostile.

"Q. Do you recognize this last page? A. Well, as I just got through telling you, I was drunk that day. I had been drunk all night long.

"Q. Please answer the question? A. I do not remember seeing it.

"Q. You don't recognize it then? Is that what you are saying? A. Yes.

"Q. Do you remember my inquiring of you on that day in the presence of those two people, 'about what time did you go'—referring now to that Sunday in July—'What time did you go to the Anchorage City Transit'. Do you remember that question?

Objection was overruled.

"A. Well, I'd rather not answer that."

"The Court: The Court instructs you to answer it. A. I did not go to it.

"The Court: Pardon me. Just answer this question.

"Q. Do you remember my asking you that question, 'About what time did you go to the Anchorage City Transit'? A. Yes, I remember you asking something about it.

"Q. Do you remember your answer, 'Between 11:45 A.M. and 1:00 P.M.'? A. I went to work at 11:15 that morning. I was mad at Russell. I just wanted to get him in trouble."

Over the objections of defense counsel the court then permitted the United States At-

torney to question Mrs. Avery by reading to her from the statement questions alleged to have been asked at the interview of December 30, 1958. Her usual answer was that she had no remembrance of the question. The answer alleged to have been given by her was then read and the witness's usual answer was that she had no recollection of having made such an answer. The context of the questions and answers (of which the witness claimed she had no knowledge) was that she rode with appellant and Boyer in a panel truck to the Anchorage City Transit garage between 11:45 A.M. and 1:00 P.M. on Sunday, July 13th; that she didn't know the purpose of the trip at first and sat in the truck; that Boyer had worked there and knew how to get in; that they (appellant and Boyer) took tires, a vacuum cleaner and several different things; that the tires were large, requiring two men to a tire; that "all three men helped"; that after the articles had been taken "they knew they'd been spotted, so I had them let me off and I went to work. I don't know where they took it"; and that appellant left town that night and did not return until the following Thursday.

Appellant argues that except where one side is genuinely surprised at the answers of its own witness and has been damaged by the answers, it should not be permitted to cross examine at length or introduce contradictory statements made on other occasions. He contends that at the outset of Mrs. Avery's examination, and before the government's case had been damaged, the United States Attorney became aware that she was not going to testify as expected and that at this point the witness should have been withdrawn. Appellant further contends that the lengthy questioning was not conducted by the government for the sole purpose of impeachment, but for the purpose of getting before the jury the substance of the statement, which tended to incriminate appellant. Finally, appellant argues that it was error for the court not to instruct the jury that the questioning based on the contents of the statement should be considered only on the question of impeachment of the witness and not as evidence against the appellant.

Appellant's argument is generally well supported by his principal authority, Young v. United States.[23] It is believed, however, that the majority of the court in that case was particularly influenced by the fact that the charge was murder in the first degree, based on a federal statute providing that one who "aids, abets, counsels, commands, induces, or procures [the] commission" of an offense is a principal. Young admittedly was not at the scene of the shooting and the main evidence implicating him as a principal was that contained in certain contradictory statements which were used to impeach witnesses. The court feared that the substance of the statements may have been improperly considered as evidence by the jury.

In United States v. Allied Stevedoring Corp.,[24] a prosecution for income tax evasion, Judge Hand observed that the historical basis for the rule that a party should not be permitted to impeach his own witness is that the party calling him vouches for his credibility. Professor Wigmore calls the rule a holdover from ancient times when the outcome of a trial was almost entirely determined by the number of "oath helpers" a party produced and not necessarily by the testimony elicited.[25] Answering the argument that the use of other inconsistent statements in examining a witness is a form of hearsay, Judge Hand points out in the case last mentioned that although the statements themselves may have no testimonial value,

"they may, however, in fact revive the witness's memory and satisfy him that he was right the first time, or, they may

23. 5 Cir., 1938, 97 F.2d 200, 201, 117 A.L.R. 316.

24. 2 Cir., 241 F.2d 925, 932, certiorari denied, 1957, 353 U.S. 984, 77 S.Ct. 1282, 1 L.Ed.2d 1143.

25. 3 Wigmore, Evidence §§ 896, 1018 (3d ed. 1940).

show him the danger of persisting in testimony whose falsity is now detected, and in making him recant"[26]

The objection is minimized on the basis that the witness who allegedly made the statements is on the stand in the presence of the jury. It might be highly probative to observe the manner of his denial. That the statement alone should not be used to infer the truth is conceded, but the statement, the denial, the present inconsistent testimony plus all else that is said and done in the presence of the jury is said to enhance the likelihood of the discovery of the truth. Many federal cases support this view.[27]

One danger in permitting the examination of a witness under such circumstances is the possibility of collusion between a witness and a party, as pointed out in State v. Steeves.[28] For example, a witness may be induced by one party to make false statements out of court to the other party. Then, when called by the other party in reliance that he will so testify, the witness truthfully tells his story in favor of the opposite party. We believe that the danger of such collusion has been over-emphasized.

At common law, and by statute in many jurisdictions, the party must have been surprised by the testimony of his witness before he was permitted to impeach. The definition of surprise under the rule seems to have been progressively relaxed to the point that some courts rely entirely on the finding of the trial judge that surprise existed.[29]

■ Appellant's argument that genuine surprise must have existed in this case before the United States Attorney could permissibly examine Mrs. Avery on the written contradictory statement is taken care of by statute in Alaska which provides that a party may show that the witness has made at other times statements inconsistent with his present testimony.[30] The only requirement is that a proper foundation be laid.[31] Since surprise is not a requirement in the quoted sections, we hold that none is required.

■ The requirement of some jurisdictions that the party's case must have been damaged before examination as to other inconsistent statements is permitted is likewise taken care of by the same Alaska statutes. Damage is not stated to be a requirement and is therefore not required.

■ We now consider whether the scope and length of the examination of Mrs. Avery permitted by the trial judge amounted

---

26. 241 F.2d at page 933.

27. Di Carlo v. United States, 2 Cir., 6 F. 2d 364, certiorari denied, 1925, 268 U.S. 706, 45 S.Ct. 640, 69 L.Ed. 1168; Curtis v. United States, 10 Cir., 1933, 67 F.2d 943; London Guar. & Acc. Co. v. Woefle, 8 Cir., 1936, 83 F.2d 325; Wheeler v. United States, 1953, 93 U.S. App.D.C. 159, 211 F.2d 19, 26, certiorari denied, 1954, 347 U.S. 1019, 74 S.Ct. 876, 98 L.Ed. 1140; United States v. Graham, 2 Cir., 102 F.2d 436, certiorari denied, 1939, 307 U.S. 643, 59 S.Ct. 1041, 83 L.Ed. 1524.

28. 1896, 29 Or. 85, 43 P. 947, 952.

29. In Wheeler v. United States, supra note 27, the prosecutor knew 6 weeks before calling the witness that she had refuted in writing a prior written statement upon which the prosecutor relied. The trial court found that the prosecutor was surprised, within the meaning of a statute that required surprise, and the appellate court upheld the finding.

30. A.C.L.A. § 58–4–59 (1949) states:
"Party's right to impeach own witness. The party producing a witness is not allowed to impeach his credit by evidence of bad character, but he may contradict him by other evidence, and may also show that he has made at other times statements inconsistent with his present testimony, as provided in section 58–4–62."

31. A.C.L.A. § 58–4–62 (1949) states:
"Impeachment by proof of inconsistent statements: Preliminary requirements. A witness may also be impeached by evidence that he has made at other times statements inconsistent with his present testimony; but before this can be done the statements must be related to him, with the circumstances of times, places, and persons present; and he shall be asked whether he has made such statements, and, if so, allowed to explain them. If the statements be in writing they shall be shown to the witness before any question is put to him concerning them."

to an abuse of discretion. We think not. The average person seldom appears in court as a witness. The dignity and gravity attendant upon such an appearance is emphasized by courtroom appearance, the procedures followed and by the oath administered, all of which encourage truthful testimony. The United States Attorney had a right to assume that Mrs. Avery had not falsified the statement given by her on December 30, 1958 and that she would so testify at the trial. Even after learning that her testimony differed radically from the previous statement, he was privileged to remind her of the details of the execution of that statement and question her concerning it. Our statutes so provide. Here, it must be noted that Mrs. Avery did not deny making the statement. Her various answers on this point led the trial judge to believe that she admitted making a statement, but couldn't remember what she said because she was drunk and mad at the time and wanted to get appellant in trouble. However, whether she admitted the statement or not, it would not be logical to require the prosecutor, when faced with such a development, to withdraw the witness. He had a right to refresh her recollection with questions and answers from the statement in the hope that at some point, or as to some particular question or answer her dimmed recollection might be refreshed, or, that if she was falsifying, she might decide to recant and tell the truth. At one point well along in the questioning her recollection was refreshed. She remembered being asked the question in the statement "about what time did you go * * * referring now to that Sunday in July * * * What time did you go to the Anchorage City Transit". After defense counsel's objection was overruled Mrs. Avery stated, "Well, I'd rather not answer that". Upon being instructed by the court to answer the witness stated, "Yes, I

remember you asking me something about it". From that point on to the conclusion of the examination however, the witness insisted she had no recollection of the questions or answers.

Appellant contends that the effect of the examination was to place before the jury the substance of the statement which was damaging to appellant and that it was considered by the jury as evidence, rather than for the limited purpose of impeachment.

██ This court subscribes to the view that the discretion of the trial judge shall govern the latitude of examination permitted in impeaching a party's own witness by showing other statements inconsistent with present testimony. The discretion exercised by the trial judge will not be disturbed on appeal unless an obvious abuse has been permitted.[32]

As pointed out earlier in this opinion, the general view is that the substance of such an examination is not to be considered as evidence of the facts in issue. The jury is generally instructed that it is to be considered for impeachment purposes only. The authorities previously referred to,[33] while not holding that the substance of such an examination standing alone can be considered as evidence, nevertheless permit the examination on the ground that, considered with all the evidence and proceedings, it may assist in discovering the truth.[34] This view, regardless of how carefully phrased, does seem to permit the examination to be considered by a jury for whatever substantive value they may wish to give to it. If the reasoning in support of the practice is sound, then it would appear to be entirely inconsistent to require the giving of a precautionary instruction in every case to the effect that such testimony should be considered for impeachment purposes only.

The basic question troubling some jurisdictions, that of whether to permit a party

---

32. Smith v. United States, 1927, 57 App. D.C. 71, 17 F.2d 223, 224.; Bedell v. United States, 1934, 63 App.D.C. 31, 68 F.2d 776, 777; Wheeler v. United States, supra note 27.

33. Cases cited note 27 supra.

34. United States v. Allied Stevedoring Corp., supra note 24.

to impeach his own witness at all by showing other inconsistent statements, is clearly answered by statute in Alaska.[35] No exceptions, limitations or restrictions are prescribed. The only requirement is that a proper foundation be laid and the witness be given the right of explanation.[36] No precautionary instruction is required, although this is not to say that such an instruction should not be given if the facts of a particular case require it.

■ This court adopts the view that generally the jury should be permitted to consider the examination of a party's own witness as to other statements inconsistent with his present testimony along with all the other evidence in the case, on the ground that such a rule improves the likelihood of determining the truth. Whether the jury should be instructed that such evidence should be entirely disregarded, viewed with caution, or limited to consideration for impeachment purposes only, lies within the discretion of the trial judge.

■ No precautionary instruction was requested by appellant and none was given by the court in this case. This was not error. No injustice could have resulted. Obviously the jury did not rely heavily on the witness Avery's testimony as it acquitted co-defendant Boyer, who had been directly connected with the commission of the theft by her statement. The witness Luther White testified that he had observed appellant at the Anchorage City Transit garage removing tires and equipment on the day the crime was alleged to have been committed. There was ample evidence aside from the contents of the inconsistent statement upon which the verdict could have been based. Appellant took no exception to the failure of the court to give a precautionary instruction.

■ Appellant urges that error was committed at the trial in not instructing the jury that the co-defendant Boyer and the witness Avery were accomplices and that it should view their testimony with distrust.

This allegation of error was not included in appellant's statement of points as is required by rule[37] and for this reason could rightfully be ignored. The court has, however, reviewed the record and authorities cited.

No request was made to the court for such an instruction. Nor was any exception taken to the court's failure to give such an instruction. Appellant's contention is that it was mandatory under the provisions of A.C.L.A. § 58-5-1 (1949), which reads in pertinent part as follows:

"Jury as judges: Instructions. The jury, subject to the control of the court in the cases specified in this code, are the judges of the effect and value of evidence addressed to them, except when it is thereby declared to be conclusive. They are, however, to be instructed by the court on all proper occasions:

\* \* \* \* \* \*

"Fourth. That the testimony of an accomplice ought to be viewed with distrust and of the oral admissions of a party with caution."

Appellant cites two Alaska authorities for the proposition that the giving of the instruction was mandatory. Neither is controlling here. In Anderson v. United States[38] the government's entire case rested on the testimony of a prostitute accomplice who had acted as procuress for appellant in a White Slave Traffic Act violation. In Stephenson v. United States[39] the trial court had refused to give the accomplice instruction although the witness was a party to a conspiracy with appellant to steal coffee and deliver it to appellant. Again, the government's entire case rested on the accomplice's testimony. In both cases the

---

35. A.C.L.A. § 58-4-59 (1949), supra note 30.

36. A.C.L.A. § 58-4-62 (1949), supra note 31.

37. Supreme Ct.R. 9(e).

38. 9th Cir., 1946, 157 F.2d 429.

39. 9th Cir., 1954, 211 F.2d 702.

witness was clearly an accomplice and the testimony was vital to conviction.

Here the record does not support appellant's claim that Boyer and Avery were accomplices. The testimony of Boyer and the examination of Avery were not crucial to the government's case. Boyer at no point in his testimony directly implicated appellant and was himself acquitted. The jury obviously disregarded the effect of Avery's examination on the inconsistent statement since it did acquit Boyer.

The judgment is affirmed.