**84**

SUNTRANA MINING COMPANY, Inc., an Alaskan Corporation, Appellant,

v.

George WIDICH and C. G. Morrison, co-partners and individually, Appellees.

No. 11.

Supreme Court of Alaska.

March 7, 1961.

———◆———

D. A. Burr and G. F. Boney, Anchorage, for appellant.

Robert A. Parrish, Fairbanks, for appellees.

Before NESBETT, C. J. and DIMOND and AREND, JJ.

NESBETT, Chief Justice.

Appellant as well as appellees question the jurisdiction of this court to hear this appeal on grounds very similar to those raised in Hobbs v. State of Alaska, Alaska, 359 P.2d 956. Since the jurisdictional issues raised here have already been considered and decided in favor of the jurisdiction of this court in the opinion just referred to, it should suffice to say that there is no lack of jurisdiction in this court to hear the present appeal.

█ The main question to be determined is whether the trial court properly submitted to the jury the interpretation of a disputed contract based on a writing with oral modifications.

Appellant mining company, an Alaska corporation, was the lessee of land near Fairbanks, Alaska, containing several seams of coal. It had conducted coal mining operations on the land for several years prior to July of 1956, and continued to mine portions of the property during the period of the controversy which caused this action.

Appellee, C. G. Morrison, was an experienced heavy equipment mechanic and welder with considerable mechanical experience in mines. Appellee, George Widich, was a competent miner with experience in both underground and strip mining operations. Together they had purchased caterpillar tractors, trucks and miscellaneous other equipment suitable for use in mining operations. Prior to July 12 of 1956 they had formed an oral partnership and pooled their equipment for the purpose of securing a contract as an independent operator to mine coal and were to share any profits on a fifty-fifty basis.

At the invitation, or at least with the encouragement of Andrew C. Costa, mine superintendent for appellant, appellees had used their tractor dozers during May, June and part of July of 1956 in an attempt to uncover from the surface mineable portions

of several seams of coal located on appellant's land. The understanding between Costa and appellees was that if appellees found mineable coal in sufficient quantity, appellant would be willing to enter into a contract with them to mine the coal for appellant to supplement its own output.

As a result of appellees' efforts a portion of No. 3 seam was uncovered which appeared to contain accessible mineable coal in sufficient quantity to justify a mining operation. The portion of the seam exposed by appellees was inspected by Costa, and Albert Swalling, President of appellant. At Swalling's invitation appellees conferred at length with Swalling and Costa on the evening of July 12, 1956, discussing the terms of a contract.

On the following day Swalling delivered to appellees a letter addressed to them which is quoted in full:

"Suntrana, Alaska
"July 13, 1956
"Mr. George Widich
"Mr. C. G. Morrison
"Suntrana, Alaska
"Dear Sirs:

"This letter is to confirm in written form the agreements reached in our conversation last evening relative to the partnership of Widich and Morrison to open a small mine on our lease, the location to be on No. 3 seam, north and west of 0 Chute of No. 2 seam.

"The coal produced will be sold only to Suntrana Mining Co. and the price is to be $3.50 per ton. Suntrana Mining Co. is to assume the 40¢ U.M.W.A. Welfare payment and the 10¢ per ton lease royalty payment to the U. S. Geological Survey. Weight for payment will be based on Suntrana's average monthly mine car weight.

"The partnership is to furnish all their own equipment, supplies, power, labor, and insurance, and is to comply with Territorial and Federal regulations where applicable.

"Point of delivery will be in a chute which Suntrana will drive from No. 2 seam in the vicinity of 0 Chute. The partnership will accomplish all preparatory aboveground work at the site, including removal of overburden at the chute.

"All development work and mining procedures, and quality control of the product will be subject to the approval of Suntrana Mining Co., through Mr. Costa.

"Development work will start immediately, with coal from such work to be stockpiled at the chute site. Actual delivery into the chute will start in October and continue through February, and can be up to 5,000 tons per month. However, so that we may plan our production, estimates of your production should be submitted at least 30 days ahead.

"Payments will be made to the partnership on the 15th of the month following delivery, and one advance on the 20th. The partnership may order supplies for their account through Suntrana Mining Co., with a handling charge of 10% to be added to the cost.

"Very truly yours,
"Suntrana Mining Co., Inc.
"s/ A. C. Swalling, President"

In accordance with the terms of the letter, appellees immediately commenced to prepare the ground for a mining operation. During the months of July and August they had uncovered as much of No. 3 seam as could be economically strip mined due to the circumstances of the terrain. The amount of coal made available was established by the expert testimony of an engineer as being 2,900 tons which was not sufficient to supply the production contemplated in the letter of July 13th. Appellees had also cleared the overburden at a place located by Costa as being the point where the chute to be driven by appellant from underlying No. 2 seam would reach the surface.

Appellees then located the face of No. 3 seam immediately across the canyon from the above mentioned workings and commenced developing it for an underground mining operation. In these preparations considerable equipment adapted to underground mining was purchased on appellant's

account and charged against appellees. Other equipment necessary to the operation was furnished or loaned to appellees by Costa, who visited the scene of their operation on several occasions.

Appellees contended at the trial that they were ready, able and willing to commence the delivery of coal on October 1, 1956 but could not do so in accordance with the terms of the contract because of the failure of appellant to drive the delivery chute provided for in the contract. It is conceded by both parties that the chute was never driven. There was testimony that appellees had requested of Costa on several occasions that the chute be driven, but that Costa had stated that he didn't have the steel or couldn't spare the men from his own mining operation, but had assured them that the chute would be driven in time for the contemplated use. Appellees claimed to have given Costa oral notice in late August of their intended coal deliveries for October and in September of their intended November deliveries. Written notice of appellees' intended delivery schedule was also given at a later date. Appellant made no response to any of these notices. Attempts were made by appellees during the months of October and November, at Costa's request, to deliver with their trucks strip coal from No. 1 and No. 3 seams directly to appellant's tipple. This effort had to be abandoned after delivery of approximately forty-seven truck loads because appellees were prevented from using the available road on appellant's property because of the prior rights of another mining company.

Appellant contended at the trial that the contract incorporated in the letter of July 13, 1956 was unilateral and that its obligation to drive the chute was dependent on the stockpiling of coal by appellees which did not happen. It also contended that the contract contemplated mining by strip methods only and that the underground operation commenced by appellees was not approved by appellant. Appellees claimed that Costa had the authority to approve the underground mining plan and specifically did so on appellant's behalf and actively cooperated in its furtherance.

Assignments of error Nos. 3 through 8 and 11 through 13 will be considered together and a decision thereon will substantially dispose of all others. They concern the court's failure to give certain requested instructions of appellant, to the general effect that the obligation of appellant to drive the chute provided for in the contract was dependent or conditional upon an obligation of appellees to first stockpile coal at the chute site and that appellant was guilty of no breach of contract unless the failure to drive the chute actually prevented appellees from stockpiling coal.

We do not believe error was committed in the respects assigned. The first sentence of paragraph four of the contract provided, "Point of delivery will be in a chute which Suntrana will drive from No. 2 seam in the vicinity of 0 chute". This provision is unconditional and clear enough. Paragraph six provided in part that "Development work will start immediately, with coal from *such work* to be stockpiled at the chute site." (Emphasis ours.) This sentence appears to mean that only coal from preparatory or development work was to be stockpiled, since this work was required to be started *immediately*. The evidence disclosed that the driving of the delivery chute would take from three to four weeks. The following sentence of the same paragraph provided that "Actual delivery into the chute will start in October and continue through February * * *."

Considered together the above provisions clearly provide that the point of delivery for all coal was to be in a chute to be provided by appellant. Development work was to start immediately after July 13th, but actual delivery into the chute would not commence until October. Coal resulting from development work was to be stockpiled at the chute site until it could be delivered into the chute. The last paragraph provided that payment would be made on the 15th of the month *following delivery*. No intent can be perceived from the letter that the stock-

piling of coal at the chute site was to be a condition in any respect. However, the related and overlapping issues raised by these assignments cannot be decided solely on the wording of the contract. Both parties agree that certain oral agreements are an integral part of their relationship.

The evidence discloses of course that only 2,900 tons of coal was available for an economic stripping operation at the point on No. 3 seam mentioned in the contract, due to the fact that the seam did not rise with the hill as had been hoped. Appellees' theory of the case was that when this fact was determined, and after they had again uncovered No. 3 seam a short distance away and across the canyon, the original mining plan was modified with Costa's approval, to provide for underground mining of the seam, with delivery still to be in the chute.

Paragraph five of the contract provided that development work, mining procedures and quality control of the coal be subject to appellant's approval, through Costa. Costa's actual authority to approve the claimed modification was disputed as well as appellees' claim that he had in fact approved. The testimony was conflicting and the court properly and fully and fairly submitted the questions to the jury. In view of the modification of the original mining plan claimed by appellees and the conflicting testimony in that respect the court obviously felt that it should leave with the jury the question of whether or not stockpiling of coal had become a condition precedent to an obligation on appellant's part to drive the chute. This was done in a portion of Instruction No. 8 in the following language:

If you find that the defendant did not have a duty to construct the chute until certain coal had been stockpiled at the chute, or some further performance had been rendered by the plaintiffs in opening or developing their mine, then the duty of the defendant in this regard is said to be a condition subsequent, the performance of which is excused until that required performance is forthcoming from the plaintiffs.

In the event of such a finding, you must then conclude that the plaintiffs are entitled to take nothing by this action unless the defendant has waived its right to insist on this performance by the plaintiffs.

A review of the evidence makes it clear that appellant had some reason to question the ability of appellees to deliver coal in great quantity from the underground operation as it existed, but the court properly left this question to the jury. There was ample testimony, expert and otherwise, to support the jury's finding of ability to deliver coal. However, there is nothing in the contract or in the evidence pro and con concerning the modification of the mining plan to support appellant's contention that before it could be found to have breached the contract the jury must have found that its failure to drive the chute actually prevented or hindered the stockpiling of coal by appellees.

The testimony of appellant's main witness hardly supports its contention that the stockpiling of coal at the chute site was a condition to be performed by appellees before appellant became obligated to drive the delivery chute and its further contention that the contract contemplated only a strip mining operation. At one point in his cross examination that witness testified that *no coal results* merely from development work performed for a stripping operation, but that *coal does result* from development work performed for an underground operation. The witness was then asked:

"Q. Now, you testified relating to the stockpiling of coal. Is it your contention that it was necessary for these plaintiffs to stockpile the 25,000 tons of coal before you drove the chute? A. No, sir."

Shortly thereafter during the same cross examination the following transpired:

"Q. All right. Is it your contention that this is a stripping operation? A. Yes, sir.

"Q. And then what coal was to be stockpiled at the chute site? A. All

of the coal that is *mineable* as a result of the development work. (Emphasis ours.)

"Q. All right. So if there was no —you are contending that if they developed 25,000 tons of coal, it was your intention that they should stockpile it all at the chute site? A. Yes.

\* \* \* \* \* \*

"Q. And it's your contention that the boys understood that on that night? A. That is correct."

On redirect the same witness testified as follows:

"Q. Do you recall any conversation on the 12th of July, 1956, with either or both of the two plaintiffs relative to how much coal had to be stockpiled at the chute site? A. Yes.

"Q. What was it to be? A. It was to be three to five thousand tons and to be a recurring stockpiling."

The portion of Instruction No. 8 previously quoted appears to have been more than fair to appellant's theory of the case.

Appellant has argued vigorously that the letter of July 13, 1956 and any oral agreements that must be considered with it, amount to nothing more than a unilateral offer to purchase coal when produced and stockpiled. We cannot agree. The trial court instructed the jury that the letter of July 13th was a complete expression and integration of the agreement of the parties as of that date. A study of the testimony convinces us that this was correct.

The testimony of appellee Morrison was that numerous discussions were had with Costa at the mine in May and June. The subject of these discussions was, "We were attempting to negotiate an agreement with them to mine coal for them". Morrison was asked, "Did you eventually arrive at such an agreement?" and answered, "Yes, sir". The testimony of appellee Widich was that discussions with Costa about mining coal for him commenced in the spring of 1956. Appellees wanted to strip No. 1 seam but Costa said the company wanted

to mine that seam itself. Costa suggested they go up on No. 2 seam and prospect, which they did, finding it too dangerous on the surface because of old underground workings. Costa then suggested they go up the canyon and see if they could salvage any of No. 3 seam. Appellees did this and after considerable work with their tractors, exposed the portion of No. 3 seam mentioned earlier in this opinion. After visiting the seam Swalling (according to Morrison's testimony) said, "Come on down and we will write up the contract; something like that. I don't know the exact words". In discussing the meeting held on the evening of July 12th Swalling testified: "I asked Mr. Morrison and Mr. Widich that if we come to a satisfactory and mutually agreeable contract, how soon they would be able to start development work, and here again I would not be able to answer which one answered that query, but the reply was that they were immediately available for that development work". He again testified: "I asked them when, if we made an agreement, that they could make delivery of coal, how soon would they accomplish development work, and there was some figuring going on and there was a conversation between the two of them that I frankly didn't hear because I was across the room, and Mr. Morrison in this case apparently acted as the spokesman and said that they could make a reasonable delivery by about October".

Appellant's attitude prior to July 12th was, in effect, "If you succeed in finding mineable coal on our property, we will discuss with you a contract for its mining". After appellees had done this with the expenditure of considerable time and money, the meeting of July 12th occurred. It is our view that when the lengthy discussions were completed on the evening of July 12th the parties had agreed on all of the terms of a bilateral contract. These terms were reduced to writing by Swalling and delivered to appellees the following morning in the memorandum of July 13th, which specifically stated that it confirmed "in written

form the agreements reached in our conversation last evening".

Considerable testimony was received concerning the meaning of the terms of the memorandum and of oral modifications. The questions thus raised were all fairly and properly presented to the jury.[1]

■ The only remaining question to be decided is that raised by specification of error No. 10, that the verdict of damages is contrary to the clear weight of the evidence. As is aptly pointed out by counsel for appellees, this specification does not comply with Rule 11(a) (6) of this court.[2] Neither has appellant designated for inclusion in the record the various exhibits received in evidence concerning damages. These same objections are applicable in varying degree to most of appellant's specifications of error. However, the court is aware of the various appellate difficulties encountered by appellant in other courts prior to the organization of this court and has therefore overlooked the omission to comply with our rules which had been only recently promulgated at the time this appeal was filed.

The complaint alleged oral and written agreements; pleaded as an exhibit a copy of appellant's letter of July 13, 1956; and alleged preparation for performance in some detail, appellees' readiness, willingness and ability to perform, the failure and refusal of appellant to construct the chute as a breach and their general damage in the sum of $71,080.00, which included lost profits in the sum of $32,550.00. Along with an

amended answer which denied any liability on appellant's part a counterclaim was filed to recover $3,346.76 for supplies ordered by appellees. In a reply appellees admitted liability in some amount for supplies.

The oral testimony presented by appellees in support of their claim for damages was voluminous and a number of exhibits illustrating their claim were introduced. Appellant introduced oral and documentary evidence to support its counterclaim. The jury awarded appellees $24,365.04 damages and from this amount deducted $1551.96 which it found appellant had proved on its counterclaim. The net award to appellees was $22,813.08.

The court's instruction advised the jury that in attempting to determine compensation, if any, due appellees for loss of profits, it must first determine with reasonable certainty the amount of coal appellees could have delivered between October 1956 and February 1957 and deduct therefrom the reasonable cost of producing and delivering the coal, including development and preparatory costs. The transcript contains a great deal of evidence pertaining to these costs and appellees' ability to deliver and, as we have said, several exhibits which itemized these costs to illustrate testimony. From a review of the evidence before us we are convinced that there was sufficient evidence of damages to go to the jury and that the formula given to them to calculate damages, if they found any were warranted, was a fair one. The judgment is affirmed.

---

1. 3 *Williston, Contracts* § 616 (rev. ed. 1936) and authorities there cited; Valentine v. Quackenbush, 9 Cir., 1917, 239 F. 832, 4 Alaska Fed. 528.

2. Rule 11(a) (6) provides (the brief shall contain) "a specification of errors relied upon which shall be numbered and shall set out separately and particularly each error intended to be urged. When the error alleged is to the admission or rejection of evidence, the specification shall quote the grounds urged at the trial for the objection and the full substance of the evidence admitted or rejected, and refer to the page number in the transcript as contained in the record on appeal where the same may be found. When the error alleged is to the charge of the court, the specification shall set out the part referred to verbatim, whether it be in instructions given or in instructions refused, together with the grounds of the objections urged at the trial. When findings are specified as error, the specification shall state as particularly as may be wherein the findings of fact and conclusions of law are alleged to be erroneous. When the error alleged is to a ruling upon the report of a referee or a master the specification shall state the objections to the report and the action of the court upon such objections."