Justice BREYER,
with whom Justice SOTOMAYOR joins, dissenting.
I agree with the Court that this case poses a special, not a general, question *1878 about Puerto Rico’s sovereignty. It asks whether “the prosecutorial powers belonging to Puerto Rico and the Federal Government derive from wholly independent sources.” Ante, at 1873 - 1874. I do not agree, however, with the majority’s answer to that question. I do not believe that “if we go back [through history] as far as our doctrine demands” (i.e., “all the way back” to the “furthest-back source of prosecuto-rial power”), we will “discover” that Puerto Rico and the Federal Government share the same source of power, namely, “the U.S. Congress.” Ante, at 1873 - 1874, 1874 - 1875. My reasons for disagreeing with the majority are in part conceptual and in part historical.
I
Conceptually speaking, the Court does not mean literally that to find the “source” of an entity’s criminal law, we must seek the “furthest-back source of ... power.” Ante, at 1875 (emphasis added). We do not trace Puerto Rico’s source of power back to Spain or to Rome or to Justinian, nor do we trace the Federal Government’s source of power back to the English Parliament or to William the Conqueror or to King Arthur. Rather the Court’s statement means that we should trace the source of power back to a time when a previously nonexistent entity, or a previously dependent entity, became independent—at least, sufficiently independent to be considered “sovereign” for purposes of the Double Jeopardy Clause.
As so viewed, this approach explains the Court’s decisions fairly well. The Federal Government became an independent entity when the Constitution first took effect. That document gave to the Federal Government the authority to enact criminal laws. And the Congress that the document created is consequently the source of those laws. The original 13 States, once dependents of Britain, became independent entities perhaps at the time of the Declaration of Independence, perhaps at the signing of the Treaty of Paris, perhaps with the creation of the Articles of Confederation. (I need not be precise.) See G. Wood, Creation of the American Republic 1776-1787, p. 354 (1969) (“The problem of sovereignty was not solved by the Declaration of Independence. It continued to be the most important theoretical question of politics throughout the following decade”). And an independent colony’s legislation-creating system is consequently the source of those original State’s criminal laws.
But the “source” question becomes more difficult with respect to other entities because Congress had an active role to play with respect to their creation (and thus congressional activity appears to be highly relevant to the double jeopardy question). Consider the Philippines. No one could doubt the Philippines’ current possession of sovereign authority to enact criminal laws. Yet if we trace that power back through history, we must find the “furthest-back” source of the islands’ lawmaking authority, not in any longstanding independent Philippine institutions (for until 1946 the Philippines was dependent, not independent), but in a decision by Congress and the President (as well as by the Philippines) to change the Philippines’ status to one of independence. In 1934 Congress authorized the President to “withdraw and surrender all right of ... sovereignty” over the Philippines. 48 Stat. 463, codified at 22 U.S.C. § 1394. That authorization culminated in the Treaty of Manila, signed in 1946 and approved by Congress that same year, which formally recognized the Philippines as an independent, self-governing nation-state. See 61 Stat. 1174. In any obvious sense of the term, then, the “source” of the Philippines’ independence (and its ability to enact and enforce its own criminal laws) was the U.S. Congress.
*1879 The same is true for most of the States. In the usual course, a U.S. Territory becomes a State within our Union at the invitation of Congress. In fact, the parallels between admission of new States and the creation of the Commonwealth in this case are significant. Congress passes a law allowing “the inhabitants of the territory ... to form for themselves a constitution and state government, and to assume such name as they shall deem proper.” Act of Apr. 16,1818, ch. 67, 3 Stat. 428-429 (Illinois); see also Act of June 20,1910, ch. 310, 36 Stat. 557 (New Mexico) (“[T]he qualified electors of the Territory ... are hereby authorized to vote for and choose delegates to form a constitutional convention for said Territory for the purpose of framing a constitution for the proposed State of New Mexico”). And after the Territory develops and proposes a constitution, Congress and the President review and approve it before allowing the Territory to become a full-fledged State. See, e.g., Res. 1, 3 Stat. 536 (Illinois); Pub. Res. 8, 37 Stat. 39 (New Mexico); Presidential Proclamation No. 62, 37 Stat. 1723 (“I WILLIAM HOWARD TAFT, ... declare and proclaim the fact that the fundamental conditions imposed by Congress on the State of New Mexico to entitle that State to admission have been ratified and accepted”). The Federal Government thus is in an important sense the “source” of these States’ legislative powers.
One might argue, as this Court has argued, that the source of new States’ sovereign authority to enact criminal laws lies in the Constitution’s equal-footing doctrine— the doctrine under which the Constitution treats new States the same as it does the original 13. See ante, at 1871 - 1872, n. 4. It is difficult, however, to characterize a constitutional insistence upon equality of the States as (in any here relevant sense) the “source ” of those States’ independent legislative powers. For one thing, the equal-footing doctrine is a requirement imposed by the U.S. Constitution. See Coyle v. Smith, 221 U.S. 559, 566-567, 31 S.Ct. 688, 55 L.Ed. 853 (1911). For that reason, the Constitution is ultimately the source of even these new States’ equal powers (just as it is the source of Congress’ powers). This is not to suggest that we are not a “ ‘union of States [alike] in power, dignity and authority.’ ” Ante, at 1872, n. 4 (quoting Coyle, supra, at 567, 31 S.Ct. 688). Of course I recognize that we are. It is merely to ask: without the Constitution (¿a, a federal “source”), what claim would new States have to a lawmaking power equal to that of them “earliest counterparts”? Ante, at 1872, n. 4.
For another thing, the equal-footing doctrine means that, going forward, new States must enjoy the same rights and obligations as the original States—they are, for example, equally restricted by the First Amendment and equally “competent to exert that residuum of sovereignty not delegated to the United States by the Constitution itself.” Coyle, supra, at 567, 31 S.Ct. 688. But this current and future equality does not destroy the fact that there is a federal “source” from which those rights and obligations spring: the Congress which agreed to admit those new States into the Union in accordance with the Constitution’s terms. See, e.g., 37 Stat. 39 (“The Territory] of New Mexico [is] hereby admitted into the Union upon an equal footing with the original States”).
In respect to the Indian tribes, too, congressional action is relevant to the double jeopardy analysis. This Court has explained that the tribes possess an independent authority to enact criminal laws by tracing the source of power back to a time of “ ‘primeval’ ” tribal existence when “ ‘the tribes were self-governing sovereign political communities.’ ” Ante, at 1872 - 1873 (quoting United States v. Wheeler, 435 *1880 U.S. 313, 322-323, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978)). But as the Court today recognizes, this prelapsarian independence must be read in light of congressional action—or, as it were, inaction. That is because—whatever a tribe’s history—Congress maintains “plenary authority to limit, modify or eliminate the [tribes’] powers of local self-government,” Santa Clara Pueblo v. Martinez, 436 U.S. 49, 56, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978), and thus the tribes remain sovereign for purposes 'of the Double Jeopardy Clause only “until” Congress chooses to withdraw that power, ante, at 1872. In this sense, Congress’ pattern of inaction (ie., its choice to refrain from withdrawing dual sovereignty) amounts to an implicit decision to grant such sovereignty to the tribes. Is not Congress then, in this way, the “source” of the Indian tribes’ criminal-enforcement power?
These examples illustrate the complexity of the question before us. I do not believe, as the majority seems to believe, that the double jeopardy question can be answered simply by tracing Puerto Rico’s current legislative powers back to Congress’ enactment of Public Law 600 and calling the Congress that enacted that law the “source” of the island’s criminal-enforcement authority. That is because—as with the Philippines, new States, and the Indian tribes—congressional activity and other historic circumstances can combine to establish a new source of power. We therefore must consider Public Law 600 in the broader context of Puerto Rico’s history. Only through that lens can we decide whether the Commonwealth, between the years 1950 and 1952, gained sufficient sovereign authority to become the “source” of power behind its own criminal laws.
II
The Treaty of Paris, signed with Spain in 1898, said that “[t]he civil rights and political status” of Puerto Rico’s “inhabitants ... shall be determined by the Congress.” Art. 9, 30 Stat. 1759. In my view, Congress, in enacting the Puerto Rican Federal Relations Act (ie., Public Law 600), determined that the “political status” of Puerto Rico would for double jeopardy purposes subsequently encompass the sovereign authority to enact and enforce— pursuant to its mm powers—its own criminal laws. Several considerations support this conclusion.
First, the timing of Public Law 600’s enactment suggests that Congress intended it to work a significant change in the nature of Puerto Rico’s political status. Prior to 1950 Puerto Rico was initially subject to the Foraker Act, which provided the Federal Government with virtually complete control of the island’s affairs. In 1917 Puerto Rico became subject to the Jones Act, which provided for United States citizenship and permitted Puerto Ricans to elect local legislators but required submission of local laws to Congress for approval. In 1945 the United States, when signing the United Nations Charter, promised change. It told the world that it would “develop self-government” in its Territories. Art. 73(b), 59 Stat. 1048, June 26, 1945, T.S. No. 993 (U.N. Charter). And contemporary observers referred to Public Law 600 as taking a significant step in the direction of change by granting Puerto Rico a special status carrying with it considerable autonomy. See, e.g., Magruder, The Commonwealth Status of Puerto Rico, 15 U. Pitt. L. Rev. 1, 14-16 (1953); see also L. Kalman, Abe Fortas: A Biography 170-171 (1990) (“[After the 1950 ‘compact,’] Puerto Rico was self-ruling, according to [Fortas], although the federal government retained the same power it would have over states in a union”).
*1881 Second, Public Law 600 uses language that says or implies a significant shift in the legitimacy-conferring source of many local laws. The Act points out that the United States “has progressively recognized the right of self-government of the people of Puerto Rico.” 64 Stat. 319. It “[f]ully recogniz[es] the principle of government by consent.” 48 U.S.C. § 731b. It describes itself as being “in the nature of a compact so that the people of Puerto Rico may organize a government pursuant to a constitution of their own adoption.” Ibid. It specifies that the island’s new constitution must “provide a republican form of government,” § 731c; and this Court has characterized that form of government as including “the right of the people to choose their own officers for governmental administration, and pass their own laws in virtue of the legislative power reposed in representative bodies, whose legitimate acts may be said to be those of the people themselves,” In re Duncan, 139 U.S. 449, 461, 11 S.Ct. 573, 35 L.Ed. 219 (1891).
Third, Public Law 600 created a constitution-writing process that led Puerto Rico to convene a constitutional convention and to write a constitution that, in assuring Puerto Rico independent authority to enact many local laws, specifies that the legitimacy-conferring source of much local lawmaking shall henceforth be the “people of Puerto Rico.” The constitution begins by stating:
“We, the people of Puerto Rico, in order to organize ourselves politically on a fully democratic basis, to promote the general welfare, and to secure for ourselves and our posterity the complete enjoyment of human rights, placing our trust in Almighty God, do ordain and establish this Constitution for the commonwealth ....
[[Image here]]
“We understand that the democratic system of government is one in which the will of the people is the source of public power.” P.R. Const., Preamble (1952).
The constitution adds that the Commonwealth’s “political power emanates from the people and shall be exercised in accordance with their will,” Art. I, § 1; that the “government of the Commonwealth of Puerto Rico shall be republican in form and its legislative, judicial and executive branches ... shall be equally subordinate to the sovereignty of the people of Puerto Rico,” Art. I, § 2; and that “[a]ll criminal actions in the courts of the Commonwealth shall be conducted in the name and by the authority of ‘The People of Puerto Rico,’ ” Art. VI, § 18.
At the same time, the constitutional convention adopted a resolution stating that Puerto Rico should be known officially as “ ‘The Commonwealth of Puerto Rico’ ” in English and “ ‘El Estado Libre Asociado de Puerto Rico’” in Spanish. Resolution 22, in Documents on the Constitutional Relationship of Puerto Rico and the United States 192 (M. Ramirez Lavandero ed., 3d ed. 1988). The resolution explained that these names signified “a politically organized community ... in which political power resides ultimately in the people, hence a free state, but one which is at the same time linked to a broader political system in a federal or other type of association and therefore does not have independent and separate existence.” Id., at 191.
Fourth, both Puerto Rico and the United States ratified Puerto Rico’s Constitution. Puerto Rico did so initially through a referendum held soon after the constitution was written and then by a second referendum held after the convention revised the constitution in minor ways (ways that Congress insisted upon, but which are not relevant here). See 66 Stat. 327; see *1882 also ante, at 1868 (describing these revisions). Congress did so too by enacting further legislation that said that the “constitution of the Commonwealth of Puerto Rico ... shall become effective when the Constitutional Convention of Puerto Rico shall have declared in a formal resolution its acceptance ... of the conditions of approval herein contained.” 66 Stat. 327-328. And, as I have just said, the convention, having the last word, made the minor amendments and Puerto Rico ratified the constitution through a second referendum.
Fifth, all three branches of the Federal Government subsequently recognized that Public Law 600, the Puerto Rican Constitution, and related congressional actions granted Puerto Rico considerable autonomy in local matters, sometimes akin to that of a State. See, e.g., S.Rep. No. 1720, 82d Cong., 2d Sess., 6 (1952) (“As regards local matters, the sphere of action and the methods of government bear a resemblance to that of any State of the Union”). Each branch of the Federal Government subsequently took action consistent with that view.
As to the Executive Branch, President Truman wrote to Congress that the Commonwealth’s constitution, when enacted and ratified, “vest[s] in the people of Puer-to Rico” complete “authority and responsibility for local self-government.” Public Papers of the Presidents, Apr. 22, 1952, p. 287 (1952-1953). Similarly, President Kennedy in 1961 circulated throughout the Executive Branch a memorandum that said:
“The Commonwealth structure, and its relationship to the United States which is in the nature of a compact, provide for self-government in respect of internal affairs and administration, subject only to the applicable provisions of the Federal Constitution, the Puerto Ri-can Federal Relations Act [ie., Public Law 600], and the acts of Congress authorizing and approving the constitution.
[[Image here]]
“All departments, agencies, and officials of the executive branch of the Government should faithfully and carefully observe and respect this arrangement in relation to all matters affecting the Commonwealth of Puerto Rico.” 26 Fed. Reg. 6695.
Subsequent administrations made similar statements. See Liebowitz, The Application of Federal Law to the Commonwealth of Puerto Rico, 56 Geo. L.J. 219, 233, n. 60 (1967) (citing message from President Johnson).
The Department of State, acting for the President and for the Nation, wrote a memorandum to the United Nations explaining that the United States would no longer submit special reports about the “economic, social, and educational conditions” in Puerto Rico because Puerto Rico was no longer a non-self-goveming Territory. U.N. Charter, Art. 73(e) (requiring periodic reports concerning such Territories). Rather, the memorandum explained that Puerto Rico had achieved “the full measure of self-government.” Memorandum by the Government of the United States of America Concerning the Cessation of Transmission of Information Under Article 73(e) of the Charter With Regard to the Commonwealth of Puerto Rico, in A. Fernós-Isern, Original Intent in the Constitution of Puerto Rico 154 (2d ed.2002). The memorandum added that “Congress has agreed that Puerto Rico shall have, under [its] Constitution, freedom from control or interference by the Congress in respect to internal government and administration.” Id., at 153.
The United Nations accepted this view of the matter, the General Assembly noting in a resolution that “the people of the *1883 Commonwealth of Puerto Rico ... have achieved a new political status.” Resolution 748 VIII, in id., at 142. The General Assembly added that “the people of the Commonwealth of Puerto Rico have been invested with attributes of political sovereignty which clearly identify the status of self-government attained by the Puerto Ri-can people as that of an autonomous political entity.” Ibid.; see also United Nations and Decolonization, Trust and Non-Self-Governing Territories (1945-1999), online at http://www.un.org/en/decolonization/ nonselfgov.shtml (as last visited June 3, 2016) (noting that Puerto Rico underwent a “Change in Status” in 1952, “after which information was no longer submitted to the United Nations” concerning this former “[t]rusteeship”).
The Department of Justice, too, we add, until this case, argued that Puerto Rico is, for Double Jeopardy Clause purposes, an independently sovereign source of its criminal laws. See, e.g., United States v. Lopez Andino, 831 F.2d 1164, 1168 (C.A.1 1987) (accepting the Government’s position that “Puerto Rico is to be treated as a state for purposes of the double jeopardy clause”), cert. denied, 486 U.S. 1034, 108 S.Ct. 2018, 100 L.Ed.2d 605 (1988).
As to the Judicial Branch, this Court has held that Puerto Rico’s laws are “state statutes” within the terms of the Three-Judge Court Act. See Calero-Toledo v. Pearson Yacht Leasing Co., 416 U.S. 663, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974). In doing so, we wrote that the 1952 events had led to “significant changes in Puerto Rico’s governmental structure”; that the Commonwealth had been “ ‘organized as a body politic by the people of Puerto Rico under their own constitution’ and that these differences distinguish Puerto Rico’s laws from those of other Territories, which are “ ‘subject to congressional regulation.’ ” Id., at 672-673, 94 S.Ct. 2080; see also, e.g., Examining Bd. of Engineers, Architects and Surveyors v. Flores de Otero, 426 U.S. 572, 597, 96 S.Ct. 2264, 49 L.Ed.2d 65 (1976) (Congress granted Puerto Rico “a measure of autonomy comparable to that possessed by the States”); Rodriguez v. Popular Democratic Party, 457 U.S. 1, 8, 102 S.Ct. 2194, 72 L.Ed.2d 628 (1982) (“Puerto Rico, like a State, is an autonomous political entity, sovereign over matters not ruled by the [Federal] Constitution” (internal quotation marks omitted)).
Finally, as to the Legislative Branch, to my knowledge since 1950 Congress has never—I repeat, never—vetoed or modified a local criminal law enacted in Puerto Rico.
Sixth, Puerto Rico’s Supreme Court has consistently held, over a period of more than 50 years, that Puerto Rico’s people (and not Congress) are the “source” of Puerto Rico’s local criminal laws. See, e.g., Pueblo v. Castro Garcia, 20 P.R. Offie. Trans. 775, 807-808, 120 D.P.R. 740 (1988) (“Puerto Rico’s ... criminal laws ... emanate from a different source than the federal laws”); R.C.A. Communications, Inc. v. Government of the Capital, 91 P.R.R. 404, 415 (1964) (transl.) (Puerto Rico’s “governmental powers ... flow from itself and from its own authority” and are not “merely delegated by Congress”); Ramirez de Ferrer v. Mari Bras, 144 D.P.R. 141, -, 1997 WL 870836, *4 (1997) (Westlaw transí.) (Puerto Rico’s “governmental powers ... emanate from the will of the people of Puerto Rico”); see also Pueblo v. Figueroa, 77 P.R.R. 175, 183, 77 D.P.R. 188 (1954) (finding that it was “impossible to believe that” the Puerto Rican Constitution is “in legal effect” simply “a Federal law”); cf. Figueroa v. Puerto Rico, 232 F.2d 615, 620 (C.A.1 1956) (“[T]he constitution of the Commonwealth is not just another Organic Act of Con *1884 gress” “though congressional approval was necessary to launch it forth”).
Seventh, insofar as Public Law 600 (and related events) grants Puerto Rico local legislative autonomy, it is particularly likely to have done so in respect to local criminal law. That is because Puerto Rico’s legal system arises out of, and reflects, not traditional British common law (which underlies the criminal law in 49 of our 50 States), but a tradition stemming from European civil codes and Roman law. In 1979 Chief Justice Trías Monge wrote for a unanimous Puerto Rico Supreme Court that the Commonwealth’s laws were to be “governed ... by the civil law system,” with roots in the Spanish legal tradition, not by the “common-law principles” inherent in “ ‘American doctrines and theories’ ” of the law. Valle v. American Int’l Ins. Co., 8 P.R. Offic. Trans. 735, 736-738, 108 D.P.R. 692 (1979). Considerations of knowledge, custom, habit, and convention argue with special force for autonomy in the area of criminal law. Cf. Diaz v. Gonzalez, 261 U.S. 102, 105-106, 43 S.Ct. 286, 67 L.Ed. 550 (1923) (Holmes, J., for the Court) (cautioning that federal courts should not apply “common law conceptions” in Puerto Rico, because the island “inheritfed]” and was “brought up in a different system from that which prevails here”).
I would add that the practices, actions, statements, and attitudes just described are highly relevant here, for this Court has long made clear that, when we face difficult questions of the Constitution’s structural requirements, longstanding customs and practices can make a difference. See NLRB v. Noel Canning, 573 U.S. -, -, 134 S.Ct. 2550, 2560, 189 L.Ed.2d 538 (2014) (“[I]t is equally true that the longstanding practice of the government can inform our determination of what the law is” (citation and internal quotation marks omitted)); see also, e.g., Mistretta v. United States, 488 U.S. 361, 401, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989); Dames & Moore v. Regan, 453 U.S. 654, 686, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981); Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 610-611, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (Frankfurter, J., concurring); The Pocket Veto Case, 279 U.S. 655, 689-690, 49 S.Ct. 463, 73 L.Ed. 894 (1929); Ex parte Grossman, 267 U.S. 87, 118-119, 45 S.Ct. 332, 69 L.Ed. 527 (1925); United States v. Midwest Oil Co., 236 U.S. 459, 472-474, 35 S.Ct. 309, 59 L.Ed. 673 (1915); McPherson v. Blacker, 146 U.S. 1, 27, 13 S.Ct. 3, 36 L.Ed. 869 (1892); McCulloch v. Maryland, 4 Wheat. 316, 401, 4 L.Ed. 579 (1819); Stuart v. Laird, 1 Cranch 299, 2 L.Ed. 115 (1803). Here, longstanding customs, actions, and attitudes, both in Puerto Rico and on the mainland, uniformly favor Puerto Rico’s position (i.e., that it is sovereign—and has been since 1952—for purposes of the Double Jeopardy Clause).
This history of statutes, language, organic acts, traditions, statements, and other actions, taken by all three branches of the Federal Government and by Puerto Rico, convinces me that the United States has entered into a compact one of the terms of which is that the “source” of Puerto Rico’s criminal law ceased to be the U.S. Congress and became Puerto Rico itself, its people, and its constitution. The evidence of that grant of authority is far stronger than the evidence of congressional silence that led this Court to conclude that Indian tribes maintained a similar sovereign authority. Indeed, it is difficult to see how we can conclude that the tribes do possess this authority but Puerto Rico does not. Regardless, for the reasons given, I would hold for Double Jeopardy Clause purposes that the criminal law of Puerto Rico and the criminal law of the Federal Government do not find their le~ *1885 gitimacy-conferring origin in the same “source.”
I respectfully dissent.